**In the Interest of D.C.D., Minor.**

**Appeal of J.T.W., Father.**

Superior Court of Pennsylvania.

Submitted Feb. 25, 2014.

Filed April 23, 2014.

David A. Strouse, Lock Haven, for appellant.

Michael D. Angelelli, Lock Haven, for Clinton County, appellee.

David I. Lindsay, Lock Haven, for Guardian Ad Litem, appellee.

BEFORE: GANTMAN, P.J., DONOHUE and STABILE, JJ.

OPINION BY DONOHUE, J.:

J.T.W. ("Father") appeals from the trial court's July 23, 2013 decree, which granted the petitions filed by Clinton County Children and Youth Services ("CYS" or "the Agency") to involuntarily terminate his parental rights to D.C.D. ("Child") pursuant to 23 Pa.C.S.A. § 2511(a)(2) and (b). Upon review, we find that the orphans' court erred as a matter of law by terminating Father's parental rights in spite of its finding that CYS failed to provide him with reasonable efforts to promote reunification prior to filing its termination petition. We therefore reverse.

In deciding a prior appeal, we previously summarized the facts of this case, in relevant part, as follows:

CYS became involved with the family the day after D.C.D.'s March 2011 birth.

The [A]gency intervened due to medical problems that D.C.D. suffered as a result of Mother's drug use and the unavailability of the then unknown birth father. The juvenile court adjudicated D.C.D. dependent on April 14, 2011. A court-ordered test subsequently confirmed Father's paternity on May 6, 2011. CYS initially placed D.C.D. in kinship care with her maternal uncle and the uncle's paramour for approximately two months; however, when that relationship dissolved, [C]hild resided with the uncle's paramour for an additional month until the paramour relinquished D.C.D. to the [A]gency during July 2011. [Child was placed in the Barnes foster home until November 2011, and was subsequently placed with the Barnes' adult daughter and her husband, where she remained at the time of the instant appeal].

\* \* \*

Father has been incarcerated throughout D.C.D.'s life. [N.T., 5/31/12,] at 8, 38–39. [Father is serving an aggregate sentence of 93 to 192 months, which he began serving prior to Child's birth. His minimum release date from prison is July 15, 2018, at which time Child will be more than seven years old. Father's maximum sentence date is October 15, 2026.]

On November 29, 2011, Father requested virtual visitations with D.C.D. *via* live video from prison in Virginia. By order dated December 12, 2011, the juvenile court directed that virtual visitation occur monthly beginning January 2012. *Id.* at 17. That order was entered over Mother's and the guardian *ad litem's* objections. *Id.* The first visitation occurred as scheduled on January 12, 2012. *Id.* at 8, 16. It lasted approximately fifteen to thirty minutes. *Id.* at 9, 40. However, due to Father's separa-

tion from the general prison population and placement in the prison's segregation unit, the Virginia prison authorities refused to permit additional virtual visitations to occur, notwithstanding the juvenile court's order. *Id.* at 18, 19. Father sought CYS's assistance in getting the virtual visitations reinstated, but [his] attempts were unsuccessful. *Id.* at 17–19. After he returned to SCI Graterford during March 2012, Father requested in-person visitation with D.C.D. because that facility was not equipped for virtual visitation. *Id.* at 35, 41, 44. However, CYS never responded to Father's request or sought to initiate visitations in accordance with the juvenile court's December 12, 2011 order. *Id.* at 20, 22, 44. Thus, despite his several requests for visitations with D.C.D., as of the date of the [first] termination proceedings, Father's total contact with his daughter amounted to a single virtual visitation. *Id.* at 9, 38.

Throughout the course of his incarceration, Father corresponded with CYS monthly and provided D.C.D. birthday and Christmas cards and gifts. In addition, he designated his niece, S.R., as a possible kinship placement resource until he was released from prison. *Id.* at 8, 16, 42–43, 44. CYS communicated with Father regularly; however, it declined to offer S.R. temporary kinship care of D.C.D. *Id.* at 57–58, 62. Instead, the [A]gency informed S.R. that it intended to terminate Father's parental rights and that she would be considered only as a permanent placement option or adoptive resource for D.C.D. *Id.* at 57–58. CYS has not interacted with S.R. since April 16, 2012, when it instructed her to contact the [A]gency to establish a time to meet D.C.D. and schedule a psychological evaluation if she desired to pursue a permanent placement such as adoption. *Id.* at 53, 57, 62–63, 64.

*In re: D.C.D.*, 1335 MDA 2012, 1–5, 68 A.3d 362 (Pa.Super. February 14, 2013) (unpublished memorandum).

On May 8, 2012, CYS filed a petition to change Child's permanency goal to adoption and to involuntarily terminate the parental rights of C.Y.D. ("Mother") and Father pursuant to 23 Pa.C.S.A. § 2511(a)(1), (5), (8), and (b).[1] The orphans' court denied termination as to Father based upon its finding that Father had tried everything he could to establish a relationship with Child and that he attempted to have Child placed with his family members. The orphans' court faulted CYS for the failure to achieve either of the concurrent permanency goals for Child of reunification or placement with a fit and willing relative. According to the orphans' court, "[t]he Agency has simply failed to assist Father. The Agency had determined the goal to be adoption before this [c]ourt even heard one piece of evidence on the requested goal change." Orphans' Court Opinion, 6/21/12, at 10–11.[2] In the juvenile court order denying the Agency's goal change request issued the same date, the court stated, *inter alia*, "The Agency shall immediately begin assisting Father in Father's attempt to establish a relationship with this child and to meet the established goals of return to parent or guardian or placement with a fit and willing relative." Court Order, 6/21/13, at ¶ 2.[3]

---

1. These sections of the Adoption Act state:

 (a) **General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

 (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

 \* \* \*

 (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

 \* \* \*

 (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

 \* \* \*

 (b) **Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
 23 Pa.C.S.A. § 2511(a)(1), (5), (8), (b).

2. Although the orphans' court found that CYS had met its burden to terminate Mother's parental rights, it declined to do so based upon its decision with respect to Father. It also denied the Agency's request to change Child's permanency goal to adoption.

3. The Honorable Craig P. Miller sat as both the juvenile court judge and the orphans' court judge in this matter. Although Judge Miller authored a scathing opinion regarding CYS's failure to provide reunification efforts to assist Father and ordered that CYS initiate services to "begin assisting Father in his at-

CYS appealed the determination to this Court, arguing that the orphans' court erred and abused its discretion by failing to terminate parents' rights. On February 14, 2013, this Court affirmed the orphans' court's decision as to Father.[4] We found that the record supported the orphans' court's finding that "CYS provided Father effectively no assistance and that, notwithstanding the dearth of services he received from CYS, Father utilized the resources available to him in prison to attempt to fashion a relationship with his daughter." *In re: D.C.D.*, 1335 MDA 2012, at 17.

Approximately 10 weeks after we rendered our decision, CYS filed a second petition to terminate Father's parental rights, this time proceeding under 23 Pa. C.S.A. § 2511(a)(2)[5] and (b). At the termination hearing, CYS caseworker Danielle Sherman testified that she transported Child to visit with Father one time at SCI Graterford on April 22, 2013, which Ms. Sherman admitted was to establish Father's lack of bond with Child for the purposes of the termination hearing. There was no evidence presented that CYS did anything to help Father establish a relationship with Child or to place Child with a fit and willing relative prior to filing the second petition to terminate his rights. Nonetheless, believing it was bound to do so by our Supreme Court's decision in *In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817 (2012),[6] the orphans' court granted CYS's petition and terminated Father's parental rights to Child. In its written opinion in support of the decree terminating Father's rights, however, the orphans' court once again found that "the Agency has simply failed to assist Father." Orphans' Court Opinion, 7/23/13, at 7.

Father filed a timely notice of appeal along with a concise statement of errors

tempt to establish a relationship with [C]hild to meet the established goals of return to parent or guardian or placement with a fit and willing relative," Judge Miller inexplicably checked the box on the form order, entered the same day, stating: "Reasonable efforts have been made by [CYS] to finalize this child's permanency plan[.]" Permanency Review Order, 6/21/12, at ¶ 4. While this could have been a scrivener's error, it is also possible that Judge Miller checked the conflicting box on the form in an effort to save CYS from the consequences of failing to provide reunification services, which could include losing federal funding as a result of its inaction in this case. *See* Orphans' Court Opinion, 6/21/12, at 11 (Judge Miller "remind[ing]" the Agency that only the court can change the permanency goal and that CYS "must work towards the goals established in the permanency plan," or risk losing funding payable for the care of Child.). In an abundance of caution, we remind Judge Miller that his duty is to enter an order supported by his findings of fact and conclusions of law, regardless of the financial consequences.

4. We reversed the orphans' court decision as to Mother and ordered the termination of Mother's parental rights.

5. "The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds: [ … ](2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S.A. § 2511(a)(2).

6. As we discuss in more detail *infra*, in *In re Adoption of S.P.*, our Supreme Court held that "incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing 'essential parental care, control or subsistence' and the length of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent,' sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2)." *In re Adoption of S.P.*, 616 Pa. at 332, 47 A.3d at 830.

complained of on appeal pursuant to Pa. R.A.P. 1925(a)(2)(i). He raises the following issues for our review:

1. The [orphans'] court committed an abuse of discretion and/or error of law in finding, pursuant to 23 Pa. C.S.A. § 2511(a)(2), that Father was incapacitated and therefore unable to provide D.C.D. with essential parental care, control or subsistence necessary for her physical or mental well-being;

2. The trial court committed an abuse of discretion and/or error of law in finding, pursuant to 23 Pa.C.S.A. § 2511(b), that termination of Father's parental rights is in the best interest of the developmental, physical and emotional needs and welfare of the child; and

3. The trial court committed an abuse of discretion and/or an error of law in terminating Father's parental rights where overwhelming evidence showed the Agency to have failed to assist Father to establish or maintain a relationship with the child, and the Agency's conduct prevented the establishment of any bond between Father and the child.

Father's Brief at 4.

 Our standard for reviewing a decree terminating a parent's rights requires that we accept all findings of fact and credibility determinations made by the orphans' court that are supported by the record. *In re T.S.M.*, —— Pa. ——, 71 A.3d 251, 267 (2013). If the orphans' court's factual findings are supported by the record, we may only reverse its decision if the court made an error of law or abused its discretion. *Id.* We may not reverse merely because we would have reached a different result based upon the facts presented. *Id.*

We begin by addressing the third issue raised by Father, as it is dispositive of the entire appeal. Detailing his efforts to have contact with Child—including regular contacts with the CYS caseworker, sending birthday cards for Child, repeatedly requesting visitation with Child, and offering family members who could transport Child to visit him in prison—Father states that CYS failed to provide him any assistance in establishing a relationship with Child. Father's Brief at 13–15. Father asserts that the orphans' court's decision to terminate his parental rights excused CYS's failure to comply with court orders requiring efforts to reunify Child with her family and condones the Agency's decision to ignore Father simply because he is incarcerated. *Id.* at 11.

The orphans' court does not disagree with Father's assessment. It found that subsequent to the June 21, 2012 order wherein the court required CYS to assist Father in developing a relationship with Child, Father only briefly saw Child following two dependency review hearings and once when CYS transported Child to see Father four days prior to filing its second petition to terminate Father's rights. Orphans' Court Opinion, 7/23/13, at 7. The orphans' court found that the Agency only scheduled the latter visit for purposes of litigation, to show the absence of a bond between Father and Child. *Id.* at 5.

In the opinion accompanying its decree terminating Father's rights, the orphans' court frames the issue as focusing on "the Agency's unclean hands or wrongful intent," and queries: "does the Agency's conduct compel this Court to ignore Father's incapacity[?]" *Id.* at 10. Based upon sections (a)(2) and (b) of the Adoption Act, and pursuant to the Supreme Court's decision in *S.P.*, the orphans' court concluded "that the Agency's conduct, al-

though relevant, does not relieve Father of Father's incapacity," and that termination was therefore required under the law. *Id.* We respectfully disagree.

■■■ Under both the federal Adoption and Safe Families Act ("ASFA") and the Pennsylvania Juvenile Act, if a child has been in foster care for 15 of the preceding 22 months, CYS is generally required to file a petition to terminate the parents' rights. 42 U.S.C.A. § 675(5)(E); 42 Pa. C.S.A. § 6351(f)(9);[7] *see also In re N.W.,* 859 A.2d 501, 507–08 (Pa.Super.2004) (identifying the intent of the Pennsylvania Legislature in passing section 6351(f)(9) of the Juvenile Act as requiring CYS to file a termination petition if a child has been in foster care for 15 of the last 22 months). An exception to this requirement exists, however, if CYS has failed to provide the family with reunification services. 42 U.S.C.A. § 675(5)(E)(iii); 42 Pa. C.S.A. § 6351(f)(9)(iii).[8] This Court has long held that the Agency must make reasonable efforts to reunify a parent with his child prior to filing a petition to terminate that parent's rights. *See, e.g., In re Adoption of R.J.S.,* 901 A.2d 502, 507 (Pa.Super.2006) ("Before filing a petition

for termination of parental rights, the Commonwealth is required to make reasonable efforts to promote reunification of parent and child."); *Fallaro v. Yeager,* 364 Pa.Super. 408, 528 A.2d 222, 229 (1987) ("Ultimately, the goal is to rehabilitate the family, reunite the child with his family or, after reasonable efforts over an appropriate period of time have failed, to terminate parental rights and free the child for adoption[.]"). It is therefore clear that the provision of reasonable efforts by CYS to reunify a family is a prerequisite to the Agency filing of a petition to terminate a parent's rights.[9] There is no exception to the requirement that CYS provide reasonable efforts to a parent prior to filing a petition to terminate simply because the parent is incarcerated.

■■ This is consistent with the constitutional protections afforded to parents regarding their children. "It has long been established that the right to make decisions concerning the care, custody, and control of one's children is one of the oldest fundamental rights protected by the Due Process Clause of the United States Constitution." *In re S.H.,* 71 A.3d 973,

**7.** Section 6351(f)(9) of the Juvenile Act became effective on January 1, 1999. *See* 1998 PA. LEGIS. SERV. Act 1998–126 (H.B. 1897). The Pennsylvania Legislature enacted section 6351(f)(9) in direct response to the enactment of ASFA to bring the Juvenile Act in line with the federal law. Pa.H.R. LEGIS. JOURNAL, 182ND Sess. 45, at 2301 (1998); *see also In re Adoption of S.E.G.,* 587 Pa. 568, 571, 901 A.2d 1017, 1019 (2006) ("In the years following the federal enactment of ASFA, Pennsylvania modified its statutes relating to dependent children to comport with the federal provisions.").

**8.** Although this provision is not contained in the Adoption Act, our Supreme Court previously stated, "to the extent that both acts relate to state intervention in the parent-child relationship, the Juvenile Act and the Adoption Act may be considered *in pari materia.*"

*In re William L.,* 477 Pa. 322, 347 n. 21, 383 A.2d 1228, 1241 n. 21 (1978) (citing 1 Pa. C.S.A. 1932); *see also In re Davis,* 502 Pa. 110, 133, 465 A.2d 614, 625–26 (1983) (plurality) ("The Adoption Act and the Juvenile Act are *in pari materia* and must be construed together as one act to accomplish the common purpose.").

**9.** We note that our Supreme Court previously held that "proof of rehabilitative aid having been offered is not a prerequisite to termination of parental rights under the statutory scheme." *In re I.L.G.'s Adoption,* 492 Pa. 507, 510, 424 A.2d 1306, 1307 (1981) (quoting *In re I.R.A.,* 487 Pa. 563, 568, 410 A.2d 755, 757 (1980)). Because these cases were decided prior to the enactment of section 6351(f)(9)(iii) or ASFA, they no longer have precedential value as to that issue.

980 (Pa.Super.2013) (citing *Hiller v. Fausey,* 588 Pa. 342, 358, 904 A.2d 875, 885 (2006), *cert. denied,* 549 U.S. 1304, 127 S.Ct. 1876, 167 L.Ed.2d 363 (2007)), *appeal denied,* —— Pa. ——, 80 A.3d 778 (2013). "[A]ny infringement of this right requires strict scrutiny review to determine whether the infringement is supported by a compelling state interest and if the infringement is narrowly tailored to effectuate that interest." *Id.* (citation and quotation omitted). There is no question the state has a compelling interest in protecting the health, safety and welfare of children. *See id.* There is also no greater infringement of a parent's liberty interest in the care, custody, and control of his child than the termination of his parental rights. *See id.* The legislature's requirement that the Agency provide reasonable efforts to promote reunification prior to filing a petition to terminate the parent's rights is a clear effort to protect the parent's fundamental right with respect to his child and to justify the state's great intrusion into that relationship.

■ In the case before us, the orphans' court found that CYS did not make reasonable efforts to reunify Child with her family. This finding is well supported by the record. It is uncontested that Father took an active interest in Child as soon as he learned of her existence and that he was her father.[10] N.T., 7/10/13, at 23. He wrote letters to Ms. Sherman and to Child's foster parents for updates on how Child was doing. *Id.* at 15; N.T., 5/31/12, at 8. He sent Child cards and gifts. N.T., 5/31/12, at 44.

Father repeatedly requested visits with Child. N.T., 5/31/12, at 38; N.T., 7/10/13, at 64–65. The juvenile court ordered that Father receive monthly virtual visitation, which occurred one time, in January of 2012. N.T., 5/31/12, at 8–9. When Father moved to SCI Graterford, which did not have the equipment to provide virtual visitation, CYS did not respond to Father's requests for in-person visits with Child. *Id.* at 44. Father suggested that his niece, S.R., transport Child to visit him, but CYS would not allow it. N.T., 7/10/12, at 64–65. Despite Father's requests and the lower court's urgings, CYS did not schedule a visit between Father and Child at SCI Graterford until April 22, 2013, four days prior to filing the second petition to terminate Father's parental rights. *Id.* at 22. Ms. Sherman admitted that "the purpose of that visit wasn't to fulfill the [c]ourt's goal, which in that particular case was reunification between [Father] and his daughter, it was to see how she'd react[.]" *Id.* at 65–66. Furthermore, although Ms. Sherman testified that CYS decided to allow the visit in February, she did not send the necessary paperwork to SCI Graterford until the Friday before the Monday visit, which resulted in delays when they arrived. *Id.* at 43. They left Clinton County at approximately 8:30 a.m., and although it was only a three-hour drive, Child did not get to see Father until after 2:00 p.m., and visiting hours ended at 3:00 p.m. *Id.* at 46, 48. Father otherwise only saw Child twice following dependency review hearings for approximately 15 minutes. *Id.* at 13, 34.

It is Father's desire to obtain custody of Child when he is released from prison. *Id.* at 27. To that end, Father suggested S.R. as a kinship caregiver for Child. N.T., 5/31/12, at 42–43. Ms. Sherman contacted S.R. at the end of March 2012. *Id.* at 52. The caseworker informed S.R. that Child was doing well in her current foster home placement and was bonded with the foster

---

**10.** It is worth noting that the record reflects that Father has five other children, each of which with whom he has a relationship. N.T., 7/10/13, at 26–27.

family. *Id.* at 52–53. Despite the concurrent goals of reunification and placement with a fit and willing relative, a CYS supervisor told Ms. Sherman that the Agency would not permit S.R. to serve as a kinship caregiver, and that S.R. would have to adopt Child. *Id.* at 57. Ms. Sherman told S.R. that Child would not return to Father's care once Father was released from prison and that S.R. would have to be Child's permanent caregiver. *Id.* at 58, 69. Ms. Sherman did not inform S.R. that Child's placement would be subsidized or of the possibility of an adoption subsidy. *Id.* at 70. In defense of CYS's recalcitrant determination that Child must be adopted in the face of the court ordered goals, the attorney representing CYS stated in his summation at the initial termination hearing: "[W]e're not going to sit around and have a child in kinship care for three or four years waiting for someone to get out of jail when the child's never had a relationship with that person." *Id.* at 80.[11]

In deciding the appeal arising from the first termination petition, this Court found that "the record sustains the orphans' court's determination that CYS provided Father effectively no assistance[.]" *In re D.C.D.*, 1335 MDA 2012 at 17. In the 10–week period between our decision and the filing of the second petition to terminate Father's parental rights, CYS likewise made no efforts to promote reunification between Child and her family. As CYS failed to fulfill its legal obligation to provide reasonable efforts to promote reunification with Father prior to filing a termination petition, the orphans' court erred as a matter of law by granting CYS's petition to terminate Father's parental rights.

Ignoring entirely its failings in this regard, CYS asserts that "Father's unrelenting blame on the Agency for his lack of bond with [Child] is disconcerting." CYS's Brief at 9. The Agency appears to interpret our Supreme Court's decision in *In re Adoption of S.P.* to absolve the Agency of that requirement and to permit termination solely on the basis of the parent's incapacity because of his incarceration. In *S.P.*, Washington County CYS filed a petition to terminate the father's parental rights to S.P., who was born in May 2005. *In re Adoption of S.P.*, 616 Pa. at 312–13, 47 A.3d at 819. The father was incarcerated and had been incarcerated prior to the child's birth. *Id.* at 312, 47 A.3d at 819. While incarcerated, the father attempted to establish and maintain a relationship with his child by sending letters and gifts to the child. *Id.* at 313, 47 A.3d at 819. The father also requested visits with the child, which the juvenile court denied. *Id.* The juvenile court changed the child's permanency goal to adoption in December 2008 and placed her with her half-sister in the care of her maternal great-aunt. *Id.* at 313–14, 47 A.3d at 819. Evidence presented revealed that the child was developmentally delayed and was possibly autistic. *Id.* at 314, 47 A.3d at 819.

In March 2009, the orphans' court granted CYS's petition to terminate the father's parental rights pursuant to section 2511(a)(2) based upon the father's repeated and continued incapacity because of his incarceration and the child's special needs and Father's inability to remedy these incapacities. *Id.* at 315, 47 A.3d at 820. The court further found that termi-

---

11. Following this Court's affirmance of the denial of CYS's petition to terminate Father's rights, it appears that CYS reinitiated the process to determine whether S.R. would be an appropriate caregiver for Child. Although S.R. and all members of her household cleared CYS's required background checks (N.T., 5/31/12, at 52), according to counsel for Father, S.R. was not approved as a caregiver because the 23 year old did not provide CYS 10 years of financial statements. N.T., 7/10/13, at 18, 73.

nation met the child's needs and welfare pursuant to section 2511(b). *Id.* at 316, 47 A.3d at 821.

The father appealed the decision to this Court, and a three-judge panel reversed. CYS successfully petitioned for reargument *en banc,* and the Court *en banc* again reversed based upon the "uncontroverted evidence of Father's efforts to establish and maintain a relationship with the child since her birth and his unassisted efforts to prepare himself to assume parental responsibilities and to enter the work force," and our conclusion, pursuant to then-existing precedent, that incarceration alone was not a sufficient basis to terminate a parent's rights. *In re Adoption of S.P.,* 32 A.3d 723, 726, 737 (Pa.Super.2011) (*en banc* ).

CYS appealed to the Pennsylvania Supreme Court, which reversed the decision of this Court and reinstated the orphans' court's decree terminating the father's parental rights. *In re Adoption of S.P.,* 616 Pa. at 333, 47 A.3d at 831. The Supreme Court held that

> incarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing 'essential parental care, control or subsistence' and the length of the remaining confinement can be considered as highly relevant to whether 'the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent,' sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*Id.* at 332, 47 A.3d at 830. The Supreme Court found that the record supported the orphans' court's determination that Father's incarceration constituted a repeated and continued incapacity that caused S.P. to be without parental care and control that the father could not remedy, as re-

quired to terminate parental rights pursuant to section 2511(a)(2). *Id.* at 332, 47 A.3d at 831. The Court further found that the record supported the orphans' court's conclusion that termination of the father's rights best served S.P.'s needs and welfare as set forth in section 2511(b). *Id.* at 333, 47 A.3d at 831.

The case at bar is distinguishable from *S.P.* because in the instant matter, we do not reach the question of whether termination of Father's parental rights pursuant to section 2511(a)(2) and (b) is supported by the record. The orphans' court in this case made a record-supported finding that CYS failed to provide reasonable efforts prior to filing its petition to terminate the father's rights. Orphans' Court Opinion, 7/23/13, at 7. Pursuant to this finding, the orphans' court should have denied CYS's petition. No such determination was made by the court in *S.P.* To the contrary, unlike in the case before us, the juvenile court in *S.P.* prohibited CYS from making certain efforts to establish and maintain contact between the father and the child, including arranging visitation between S.P. and her father, as that court concluded it was not in the child's best interest. *See In re Adoption of S.P.,* 616 Pa. at 313, 47 A.3d at 819. As stated *supra,* the lower court in this case specifically ordered CYS to assist Father in establishing and maintaining a relationship, and CYS failed to comply.

We recognize that at this point D.C.D. has been in foster care for three years. While we loathe to delay permanency in this matter, CYS has left us no choice. By brazenly violating the orders of the juvenile court and the orphans' court and the findings of this Court, and deciding on its own that it need not provide any reunification efforts to Father, the Agency violated Father's due process rights and prematurely filed its petition to terminate his

parental rights. CYS's decision to impose its will in this case has resulted in its unnecessary protraction. The finding of the orphans' court that CYS failed to make reasonable efforts to assist Father prior to filing a petition to terminate his parental rights, which is amply supported by the record, requires reversal of the orphans' court's decree terminating Father's parental rights.

Decree reversed. Jurisdiction relinquished.