J-S54001-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN INTEREST OF: J.I.H., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.E.S., FATHER | No. 755 MDA 2014 |

Appeal from the Decree April 4, 2014
In the Court of Common Pleas of Dauphin County
Orphans' Court at No(s): 7-AD-2014, CP-22-DP-59-2012

BEFORE: LAZARUS, J., MUNDY, J., and STABILE, J.

MEMORANDUM BY LAZARUS, J.          **FILED SEPTEMBER 24, 2014**

E.E.S. (Father) appeals from the order of the Court of Common Pleas of Dauphin County, which terminated his parental rights to his minor daughter, J.I.H. (d/o/b 1/4/11). After careful review, we affirm.

The trial court summarized the procedural and factual history of this case as follows:

Procedural History

On August 1, 2012, K.M.H. (Mother) signed a voluntary placement agreement for . . . J.I.H. J.I.H. was placed in a Dauphin County Social Services for Children and Youth (CYS) foster home with Mr. and Mrs. [S.] on August 1, 2012, where she has remained since.

CYS filed a dependency petition in this case on August 3, 2012. Then, on August 6, 2012, a shelter care hearing was held. After an adjudicatory and dispositional hearing on August 15, 2012, J.I.H. was found dependent and placed in the legal custody of CYS. Permanency Review hearings were held on November 13, 2012; February 14, 2013; May 23, 2013; August 8, 2013 and December 17, 2013.

Subsequently, a goal change hearing was held on April 3, 2014. This Court entered an order on April 3, 2014 granting a goal change to adoption and terminating Father's parental rights.

Factual Background

CYS became involved in the present case when CYS received a referral on August 1, 2012. Valerie Broody, a caseworker with CYS, has been involved with this case since November 27, 2012. An adjudication and disposition hearing took place on August 15, 2012, and J.I.H. was adjudicated dependent. Ms. Broody testified that Father was not present during the August 15, 2012 hearing. However, at that hearing, Father was given the service objective to present himself to CYS to establish paternity, then at that point, Father would be assessed regarding his ability to provide safe and permanent care to J.I.H. Ms. Broody further testified that Father would be expected to maintain consistent contact with his child and complete any other service objectives determined to be necessary for him to provide a safe and permanent home.

Father was present for a hearing on November 13, 2012 and again for a hearing on August 8, 2013. Between those two dates, Father did not make contact with CYS in any way. Upon meeting with Father on August 8, 2013, Ms. Broody explained that the 15 month mark on the Adoption and Safe Families timeline was approaching and that Father would need to take action to become involved in J.I.H.'s life. Father indicated that he was not looking to be a resource for J.I.H. and that he only wished to get to know J.I.H. Ms. Broody noted that prior to J.I.H. coming into care at 18 months old, Father did not have a relationship with J.I.H. CYS did set up visitation for Father and J.I.H. and visits did take place on September 5, 2013 and September 19, 2013. Ms. Broody testified that at both visits, Father failed to interact with J.I.H., even after he was encouraged to do so by staff. Ms. Broody added that J.I.H cried throughout the second visit with Father. Other than these two visits, Father has not seen J.I.H.

Father was incarcerated at Dauphin County Prison from November 15, 2011 to October 11, 2012; from February 7, 2013 to August of 2013 and from October 15, 2013 to the present. Currently, Father is incarcerated for absconding from work release. Previously, Father was incarcerated for violating his parole. Originally, Father was incarcerated from 2001-2009

after being charged with kidnapping to inflict terror and bodily injury, aggravated assault, rape with threat of forcible compulsion, involuntary deviate sexual intercourse, two counts of threat of forcible compulsion, unlawful restraint with risk of serious bodily injury and kidnapping to facilitate a felony. When Ms. Broody met with Father in Dauphin County Prison in November of 2013, Father expressed that he could not be a resource for J.I.H.

Currently, J.I.H. resides with Mr. and Mrs. [S.] and has spent over 30 months in the [S.'s] home. Ms. Broody testified that J.I.H. calls Mr. and Mrs. [S.] "mom-mom" and "daddy" and that she is a happy child who is very loved. Ms. Broody testified further that Mr. and Mrs. [S.] maintain all of J.I.H.'s health, safety and welfare needs and that there would be no negative impact to terminating Father's parental rights.

Trial Court Opinion, 5/29/14, at 1-4.

Following the entry of the trial court's order terminating Father's parental rights, Father filed this timely appeal in which he raises one issue for our review:

Did the trial court abuse its discretion or commit legal error by terminating Father's parental rights, despite evidence of the agency's failure to provide Father – who is incarcerated – with meaningful reunification services, which is a prerequisite under section 6351(f)(9)(iii) of the Juvenile Act, 42 Pa.C.S. § 6351(f)(9)(iii), to filing a petition to involuntarily terminate parental rights under section 2511(a) of the Adoption Act, 23 Pa.C.S. § 2511(a)?

Appellant's Brief, at 4.

We apply the following standard of review where the trial court has ordered the termination of parental rights:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support

for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (internal citation omitted).

Section 6351(f) of the Juvenile Act provides in relevant part:

**(f) Matters to be determined at permanency hearing. –** At each permanency hearing, a court shall determine all of the following:

\* \* \*

(9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

\* \* \*

(iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

42 Pa.C.S. § 6351(f)(9)(iii).

With respect to section 6352(f)(9)(iii), this Court recently stated:

It is . . . clear that the provision of reasonable efforts by CYS to reunify a family is a prerequisite to the Agency filing of a petition to terminate a parent's rights. There is no exception to the

- 4 -

requirement that CYS provide reasonable efforts to a parent prior to filing a petition to terminate simply because the parent is incarcerated.

*In the Interest of D.C.D.*, 91 A.3d 173, 179 (Pa. Super. 2014), *appeal granted*, 93 A.3d 802 (Pa. 2014).

Here, the record indicates that when the CYS caseworker first met with Father in August 2013, she provided him with information about parenting classes. N.T. Termination Hearing, 4/3/14, at 33. However, Father did not follow up on this, either while released from prison or while incarcerated. Father told CYS that he wanted to get to know J.I.H., but that he did not think he could be a resource for her. *Id.* at 13, 15, 21, 23. Even so, CYS worked with Father to schedule visitation for him. In September 2013, while Father was on work release, he participated in two supervised visits with J.I.H. *Id.* at 13. However, during the visits he barely interacted with the child. *Id.* Although a third visit was scheduled for October 3, 2013, Father contacted the caseworker and informed her that he would not be able to attend. *See* Contact Summary/Safety Assessment, 10/3/13, at 1. Shortly thereafter, on October 15, 2013, Father absconded from work release, and was later re-incarcerated.

The CYS caseworker met with Father in November 2013, at which point he again indicated that he could not be a resource for J.I.H., but simply wanted to get to know her. N.T. Termination Hearing, 4/13/14, at 15.

Testimony at the termination hearing established that Father never celebrated a birthday with J.I.H., never sent her gifts, cards or letters, and has never provided her with clothing or other necessities. *Id.* at 25. Although Father claimed not to have known the address of the foster home where J.I.H. was living, the address appeared on the court documents sent to him. *Id.*

These facts are in stark contrast to *In the Interest of D.C.D.*, *supra*, where this Court reversed the termination of a father's parental rights when it determined that the child protection agency did not make reasonable efforts to reunify a child with her incarcerated father whose conduct indicated his desire to be reunified with his child. The father, who was incarcerated at the time of D.C.D.'s birth, took an active interest in her as soon as he learned of her existence. He repeatedly requested virtual and in-person visitation with her. He sent her birthday cards, Christmas cards, and gifts. He corresponded with CYS monthly, and designated his niece as a possible kinship resource on his behalf until he was released. This Court found that the father "utilized the resources available to him in prison to attempt to fashion a relationship with his daughter." *D.C.D.*, 91 A.3d at 177.

Here, CYS established that although Father expressed a desire only to get to know J.I.H., it made reasonable efforts to promote reunification between J.I.H. and Father. While Father was incarcerated, CYS sent him Family Service Plans, court documents and correspondence regarding J.I.H.

Although the Commonwealth is required to make reasonable efforts to promote reunification between parent and child, "its obligation in this regard is not indefinite . . . because in addition to the parents' interests the Commonwealth must also respect the child's right to a stable, safe, and healthy environment." *In re Adoption of M.E.P.*, 825 A.2d 1266, 1276 (Pa. Super. 2003).

Based on our review of the record, the trial court did not abuse its discretion or err as a matter of law when it determined that CYS provided Father with adequate reunification services.[1]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 9/24/2014

_____

[1] We note that Father does not argue on appeal that the trial court abused its discretion or committed an error of law by terminating Father's parental rights pursuant to sections 2511(a) & (b) of the Juvenile Act. "Rather, [F]ather contends the trial court should never have applied this test against him, because the agency failed, in the first instance, to satisfy a statutory condition to seeking an involuntary termination of his parental rights." Appellant's Brief, at 13.