J-S09028-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INTEREST OF: B.H., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: E.F., | |
| Appellant | No. 1393 WDA 2014 |

Appeal from the Order June 20, 2014
In the Court of Common Pleas of Butler County
Orphans' Court at No(s): O.A. NO. 54 OF 2013

BEFORE:  FORD ELLIOTT, P.J.E., BOWES, and ALLEN, JJ.

MEMORANDUM BY BOWES, J.:                    **FILED FEBRUARY 17, 2015**

E.F. ("Father") appeals from the June 20, 2014 order terminating his parental rights to his son, B.H.  We affirm.

B.H. was born during March 2008 of an amorous relationship between Father and A.H. ("Mother").  Butler County Children & Youth Services ("CYS") assumed physical custody of B.H. on April 9, 2012, and it instituted a dependency petition on May 4, 2012, averring that the child was without proper parental care or control, as follows.  On April 6, 2012, Father had assaulted Mother and was incarcerated in the Allegheny County Jail.  Mother, who resided in Butler County, overdosed on drugs and was hospitalized at Mercy Hospital in Pittsburgh, Allegheny County.  Mother overdosed a second time on May 4, 2012, and was hospitalized in the psychiatric unit at Butler Memorial Hospital.  Father had a criminal past, and Mother had a history of

extensive drug and alcohol abuse as well as mental health issues. On May 4, 2012, CYS was awarded custody of B.H.

An un-transcribed hearing was held before a master, who outlined the events that occurred at that proceeding. Mother was present with counsel. Father was not present but his interests were represented by an attorney. The supervising caseworker for CYS, Denna Hays, testified as follows. She spoke with Father on May 17, 2012. Father confirmed that he would be incarcerated until, at a minimum, September 2012. Ms. Hays reported that Father told her that "he has not seen the Minor Child for at least two years." Master's Supplemental Findings and Recommendations as to Adjudication Hearing of May 23, 2012, 5/29/12, at 2. After assuming custody, CYS placed B.H. in the care of maternal grandmother. Mother consented to that arrangement, and Father similarly informed Ms. Hays that "he was fine with that placement continuing." *Id*.

The master recommended that the child be adjudicated dependent, continue in kinship placement with maternal grandmother, that Mother be permitted visitation as supervised by grandmother, and that, due to his incarceration, no provision for visitation by Father be accorded. The recommended goal was reunification.

Review hearings were held and the following findings were issued after those hearings. Father was released from Allegheny County Jail on October 11, 2012, contacted the caseworker assigned to this matter, and asked to

visit B.H.  Father was referred to Family Pathways for therapeutic visitation since, at that time, B.H. had not seen Father for two and one-half years. Father did not contact Family Pathways and never visited his son.  He was re-incarcerated in the Allegheny County Jail on February 23, 2013, based upon charges of aggravated and simple assault, disorderly conduct, and public drunkenness.  Father pled guilty to charges stemming from the February 23, 2013 incident, and he was sentenced on July 10, 2013, to forty to eighty months incarceration.

In county jail, Father applied and was wait-listed for three programs: Violence Prevention, Domestic Violence Group, and Electrician Training. Father claimed that he did not visit his son during his four and one-half months of freedom because he was unable to afford public transportation. He did not complete any of the programs in county jail, and, by October 8, 2013, was transferred to a State Correctional Institution.  He had not called his son, but mailed him three letters from jail.

B.H., who had been diagnosed with autism spectrum disorder, was doing well with maternal grandmother.  Grandmother was attending to the child's therapeutic needs by taking him to therapy at Family Pathways and enrolling him in occupational therapy.  Home visits by CYS with maternal grandmother and B.H. established that she was providing him with a safe, caring, and nurturing environment.

On December 16, 2013, CYS instituted a petition for involuntary termination of Father's parental rights indicating that maternal grandmother wanted to adopt B.H. A goal change also was sought from reunification to adoption. The hearing was held on May 16, 2014, where Father was represented by counsel and testified via telephone. Mother consented to termination of her parental rights. The CYS caseworker for this matter, Bryant Rummel, testified that he was assigned this case soon after CYS assumed custody of B.H. Mr. Rummel testified that placement letters were mailed to Father's side of the family, but nobody from the paternal family contacted CYS about B.H. Mr. Rummel had spoken with Father's mother in order to ascertain Father's whereabouts. Paternal grandmother did not inquire about B.H.'s welfare during any of those conversations.

Mr. Rummel reported that he sent Father the family service plan and, under that plan, Father was to "maintain contact with [B.H. and] seek any programs available to assist him while he was incarcerated[.]" N.T. Hearing, 5/16/14, at 10. In the two years that transpired between the dependency declaration and termination proceeding, Father sent B.H. letters in August, 2012, as well as on July 9, 2013, November 2, 2013, December 30, 2013, January 1, 2014, and May 15, 2014, which was the day before the termination hearing. *Id*. at 25. He sent letters addressed to Mr. Rummel on May 25, 2012 and December 17, 2012 asking about B.H. *Id*. Father never spoke with his son by telephone.

- 4 -

Mr. Rummel stated that, when he was released from jail in October 2012, Father did ask to visit the child. Mr. Rummel placed a referral for supervised visitation between Father and B.H. through Family Pathways, but visitation did not occur. Mr. Rummel later discovered that Father had contacted Family Pathways to report that he had no means of transportation from Pittsburgh to Butler and that he would arrange for visitation once he was employed. *Id*. at 28. Mr. Rummel testified that Father never contacted CYS to ask for assistance with transportation so that no visitation occurred during Father's period of freedom. *Id*. at 16, 27. In jail, Father did not complete any programs designed to help his parenting skills or his ability to support B.H. Father had completed one program called Victim's Awareness Program. *Id*. at 23. Father also did not seek help in obtaining entrance into any of the programs offered in jail.

Mr. Rummel testified that B.H. would not know Father since the boy had so little contract with Father before CYS opened its case in April 2012, and then no contact from April 2012 to May 2014. Mr. Rummel, who visited maternal grandmother's home several times, outlined that B.H. and his grandmother had "a very nurturing relationship and [B.H. was] very bonded" to his maternal grandmother. *Id*. at 33. Additionally, maternal grandmother was "very proactive and she [was] dealing with [B.H.'s therapeutic] needs." *Id*.

Donna Cosme, the case manager from Family Pathways, confirmed that maternal grandmother "followed through with all recommendations" for therapy in connection with B.H.'s autism disorder. *Id*. at 52. Additionally, maternal grandmother was a nurturing and attentive caregiver, affectionate with the child, praised him appropriately, and verbally corrected him when necessary. *Id*. at 53. B.H. sought out his grandmother for comfort and attention, and referred to her as "Memaw." *Id*.

B.H. attended kindergarten and was due to be promoted to first grade. He and his grandmother engaged in activities together, and grandmother made sure he attended all well-child examinations and dental appointments. Grandmother and B.H. successfully completed Parent-Child Interactive Therapy. Ms. Cosme visited the home twice per month and reported that there was genuine love and affection and a strong bond between B.H. and his grandmother. Maternal grandmother permitted paternal grandmother and B.H.'s half-brother, who was Father's other son, to speak with B.H. on the telephone.

Father testified at the hearing as follows. His minimum release date was June 23, 2016. Father did not reside with Mother while she was pregnant with B.H., they reunited the day that he was born, and they resided together one year thereafter. *Id*. at 65 (Father acknowledged that he lived with Mother until sometime in 2009 but could not recall the month). When asked if he had a custody arrangement with Mother after leaving her

home in 2009, Father said that he did not have an agreement with Mother but that he was told to arrange to see B.H. through maternal grandmother. Father admitted that he never followed through with maternal grandmother to visit with B.H. *Id*. at 65-66. He said that "from 2009 forward" until his April 6, 2012 incarceration, he saw B.H. "[o]nce or twice." *Id*. at 66.

Father continued as follows. Even though he was working while he was not in jail from October 2012 to February 2013, he was unable to afford public transportation to visit his son. Father maintained that he used his earnings to look for a better job. Father represented that he spoke with B.H. on the telephone on a few occasions while he was not incarcerated. Father claimed that he sent eleven letters to B.H. rather than the six reported by Mr. Rummel.

Father acknowledged that there was a protection from abuse order entered against him in 2008 with respect to Mother and that it was effective for three years. He also admitted that he had not seen his son at all since March 2012, and never financially supported the boy. He said that he spent two days with B.H. immediately after his birthday during March 2012, and that he made dinner for his son and put him to bed. Father also testified that he asked Mr. Rummel for help with obtaining public transportation but that the request was refused.

In rebuttal, Mr. Rummel denied that Father ever asked for financial assistance for public transportation to attend visitation at Family Pathways,

and stated that, if Father had made such a request, he would have explored whether it was possible to obtain the funding.

Based on the evidence adduced at the termination proceeding and the record of the dependency proceedings, which were included as an exhibit in the certified record, the orphans' court terminated Father's parental rights under 23 Pa.C.S. §§ 2511(a)(2), (a)(5), and (a)(8). It also found that the termination was in the best interests of B.H.

This appeal followed, and Father raises the following issues on appeal:

1. Did the Butler County Children and Youth Services, without justification, fail to provide reasonable efforts in the form of jail visits between Father and son as well as failing to assist Father with financial assistance for transportation so that Father could visit with son during scheduled supervised visits held in Butler?

2. Did the trial court commit an error of law and an abuse of discretion by asserting facts in the Findings of Facts, Opinion and Order of Court granting the Petition for Termination of Parental Rights that were not supported by the record of the hearing?

3. Did the trial court commit an error of law and an abuse of discretion by failing to make a relevant and necessary inquiry into the adequacy of the efforts or lack thereof made by CYS in evaluating the Petition to Terminate Parental Rights?

4. Did the trial court fail to properly consider the Child's best Interest with regard to the fact that Father has repeatedly demonstrated by every avenue available to him to resume a father/son bond upon his release from incarceration?

Appellant's brief at 4.

Our Supreme Court has recently re-affirmed the applicable standard of review in the involuntary termination of parental rights setting:

When reviewing a trial court's decision to grant or deny a termination of parental rights petition, an appellate court should apply an abuse of discretion standard, accepting the findings of fact and credibility determinations if they are supported by the record, and reversing only if the trial court made an error of law or abused its discretion. As we have noted, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

*In re D.C.D.*, 2014 WL 7089267, 7 (Pa. 2014) (citation and quotation marks omitted).

Section 2511(a) of Title 23 provides that a parent's right to a child may be granted on any one of the following bases, which the court applied herein:

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12

- 9 -

months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S. § 2511(a).

After grounds for termination is established under subsection (a) by clear and convincing evidence, the trial court must then consider if termination is in the best interests of the child, as set forth in 23 Pa.C.S. 2511(b): "Other considerations.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." **D.C.D.**, **supra**, Subsection (b) additionally provides:

The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

As we have observed, "This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a)." **In the Interest of M.T.**, 101 A.3d 1163 (Pa.Super. 2014). In the present case, we will affirm termination under § 2511(a)(8).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re K.M.*, 53 A.3d 781, 789 (Pa.Super. 2012) (citation omitted). It is important to observe that "termination under Section 2511(a)(8), does **not** require an evaluation of [the parent's] willingness or ability to remedy the conditions that led to placement" of the child. *Id*. (citation omitted; (emphasis in original).

Herein, the evidence was clear and convincing. B.H. was removed from parental care under a voluntary agreement. At the May 24, 2012 dependency proceeding, Mother consented to the placement, and the CYS caseworker testified that Father also agreed with B.H.'s placement in maternal grandmother's home. Significantly, Father fails to challenge to any extent that he consented to B.H.'s placement in the custody of CYS and kinship foster care in the home of the maternal grandmother. More than twenty months, well in excess of the twelve months mandated by Section 2511(a)(8), elapsed from the April 9, 2012 removal of B.H. from his Mother's home until the December 16, 2013 petition to terminate. The circumstances that led to the removal of the child were Father's incarceration and Mother's mental health and drug issues. Those conditions continued to exist on May 16, 2014, the date of the termination hearing, as

Father was incarcerated and would continue to be jailed for, at a minimum, two more years.

The record establishes that B.H. had seen Father, at most, once or twice from the age of one until the age of four, and never saw Father from the age of four until the age of six. It also establishes that B.H. would not even remember Father. The record is replete with evidence of a loving, nurturing, and health relationship between B.H. and maternal grandmother, who has met all of his physical, therapeutic, and emotional needs from May 2012 to May 2014. She wants to adopt the child, and thereby provide him with a permanent and loving home. *See In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013) ("Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents."). Thus, termination of Father's parental rights would best serve the needs and welfare of B.H. CYS established by clear and convincing evidence the grounds for termination of Father's rights under § 2511.

Father's first and third contentions are coextensive. He claims that the trial court committed an error of law when it terminated his parental rights without examining the efforts made by CYS toward reunification. He observes that he was entitled to CYS reunification services even though incarcerated, and notes that CYS allowed jail visitation between Mother and child while affording him no similar accommodation. He also assails CYS's

failure to provide him money for public transportation to visit his son during his four and one-half month period of freedom from incarceration. He relies upon *In re D.C.D.*, 91 A.3d 173 (Pa.Super. 2014), which held that a parent's rights cannot be terminated, as a matter of law, if the child welfare agency in question failed to provide reasonable reunification efforts. That case was overruled by our Supreme Court in *In re D.C.D.*, *supra*, which we now analyze.

In *In re D.C.D.*, our High Court ruled that the scope and type of reunification efforts made by a child welfare agency cannot, as a matter of law, prevent termination. *Id*. at *8-9. Specifically, the High Court reasoned,

> Accordingly, while reasonable efforts should be considered and indeed, in the appropriate case, a trial court could insist upon their provision, we hold that nothing in the language or the purpose of Section 6351(f)(9) forbids the granting of a petition to terminate parental rights, under Section 2511, as a consequence of the agency's failure to provide reasonable efforts to a parent.

*Id*. at *9. Hence, Father's invocation of our now-abrogated holding requiring agencies to demonstrate evidence of reasonable efforts as a prerequisite to terminating parental rights is unavailing.

Father's second position is that there is no record support for a number of the factual findings of the orphans' court. He first assails the orphans' court determination that there was domestic violence in B.H.'s home. He relies upon the fact that he assaulted Mother on April 6, 2012, in Pittsburgh, where he was first incarcerated, rather than B.H.'s home in

Butler. Father then claims that there was only one PFA entered against him and that PFA was entered in 2012.

Father has overlooked his own admissions at the termination hearing. Father testified that Mother obtained a PFA order against him in 2008 that was effective for three years. Specifically, he stated that, in addition to the PFA that Mother obtained in 2012, a three-year PFA in effect for Mother was entered "around 2008" and that he was not released from the PFA order until October 17, 2011. N.T. Hearing, 5/16/14, at 73. He further admitted that the PFA "went into effect after [B.H.] was born in March of 2008" and that he, Mother, and B.H. were "living together as a family at that time." *Id*. These admissions establish a history of domestic violence by Father in B.H.'s home.

Father also contests that there is record support for the orphans' court statement that Father and Mother "were able to agree to a custody arrangement, although no Court Order has been issued regarding custody of Child. At that time, Father saw Child one or two times." Trial Court Opinion, 6/20/14, at 1. Once again, this factual finding is firmly premised upon the evidence provided by Father at the termination proceeding.

Father reported that, after he left Mother in 2009, he and Mother had no formal custody arrangement, but that he was allowed to arrange to see B.H. through maternal grandmother. N.T. Hearing, 5/16,14, at 65. This statement confirms that he and Mother agreed to a custody arrangement

whereby he could visit B.H. through contact with maternal grandmother. After outlining the informal agreement, Father then admitted that he never actually visited with B.H. Father said that, after he left Mother in 2009, "on several occasions," he "attempted to make contact" with grandmother. *Id*. Father continued that, since maternal grandmother was going through a "hard period with the passing of family members," he was not able to see B.H. *Id*. Father also admitted that his failure to see B.H. was not solely the result of grandmother's family issues. Father reported that "things [also] had gone wrong on my end . . . so things just didn't work out as well as planned, or, whatever, to see [B.H.]." *Id*. at 65-66. Counsel then asked whether Father saw his son at all after 2009, and Father responded, "Once or twice." *Id*. at 66. Thus, the record supports the trial court's finding that there was no custodial order in place, that the parties agreed that custody was to be coordinated through maternal grandmother, and that Father did not follow through on arranging to see his son. Father supposedly saw B.H. on one or two occasions from 2009, when he left Mother, until he was incarcerated on April 6, 2012. However, Father's representation in this respect is contradicted by his other testimony, which was that from 2009 onward, he had to make visitation arrangements through maternal grandmother and that he never managed to make those arrangements.

Father also takes umbrage with the orphans' court's statement that Father had not seen B.H. in the two years prior to the May 24, 2012

dependency hearing. He notes that this factual finding was premised upon the testimony of a CYS caseworker, who was reporting what Father told her during a conversation that they had. He observes that he was not present at the dependency hearing and that he had no opportunity to contest making that remark.

Father's testimony at the termination proceeding was that he saw B.H. once or twice from 2009 to 2012. Such an abysmal visitation record does not provide grounds for avoiding termination under § 2511(a)(8). The only real question is whether either of those two visits even transpired and that, if they did, the visits occurred after May 24, 2010. Father represented that he visited the child soon after March 24, 2012, but the orphans' court specifically concluded that the representation was fabricated in order to avoid termination and that it was "biased and not credible." Trial Court Opinion, 6/19/14, at 3. We find no reason to disturb that credibility termination given Father's own admissions as to the extent of his involvement in B.H.'s life for three years. Indeed, in light of Father's acknowledgement that he was supposed to arrange to meet B.H. through grandmother and failed to do, there is record support for a determination that Father did not see child at all from 2009 through April 6, 2012.

Father also suggests that the trial court's findings that his family was notified of the placement by letter and the dates of his incarceration were unsupported by the record. Mr. Rummel testified that he sent letters

regarding placement to all maternal and paternal relatives, and the orphans' court was free to rely on that testimony, which had no impact on whether Father's rights should be terminated. Father himself testified as to when he was released from prison in October 2012 and when he was re-incarcerated in February 2013. We thus reject these challenges to the court's factual findings in this respect.

Finally, Father assails the orphans' court's determination that he had an extensive criminal history and used drugs. At the termination proceeding, Father admitted that he was incarcerated in February 23, 2013 for aggravated assault, simple assault, disorderly conduct, and that he was jailed for assaulting Mother on April 6, 2012. The record also supports that: on July 9, 2010, Father was charged with criminal mischief and possession of an instrument of crime; and, on December 4, 2008, he was charged with possession of marijuana and disorderly conduct. N.T. Hearing, 5/16/14, at 41-42. Thus, the orphans' court's finding that Father was involved with drugs and had a criminal history is supported by the record.

Father's last position is that the orphans' court improperly failed to consider the bond between Father and B.H. in analyzing B.H.'s needs and welfare under § 2511(b). We observe that Father concedes that the orphans' court's analysis under § 2511(b) was otherwise sound. Indeed, grandmother was satisfying all of B.H.'s developmental, physical, and emotional needs and welfare. They had a strong bond, and he looked to her

for care and comfort. Grandmother was loving and nurturing and wanted to adopt the child.

We conclude that the record supports that no bond existed between Father and B.H. for the court to consider. The court found that Father never saw the child during the two years that preceded May 24, 2012. This finding was supported by the CYS caseworker's testimony at the dependency hearing that Father admitted that he had not seen B.H. for two years. Additionally, Father testified at the termination hearing that, after he left Mother in 2009, there was an agreement that he was to coordinate any visits with B.H. through maternal grandmother. He then stated that he never organized a visit with B.H. through maternal grandmother due to her family issues and his own defaults. Father admittedly did not see B.H. after April 6, 2012, when Father was incarcerated for assaulting Mother. Thus, Father never visited his son from the time the boy was two years old until he was six years old, and Father will remain incarcerated until the child is at least eight years old. "As there is no evidence of a parent-child bond between Father and [B.H.], it is reasonable to infer that no such bond exists." *In re A.D.*, 93 A.3d 888, 901 (Pa.Super. 2014). Hence, the orphans' court herein did not err in not considering a non-existent bond between Father and B.H.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/17/2015