J-A29014-14
J-A29015-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| IN RE: P.R.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., A/K/A J.M., FATHER | : | No. 601 WDA 2014 |

Appeal from the Order dated March 21, 2014,
Court of Common Pleas, Allegheny County,
Orphans' Court at No. TPR 158 of 2013

---

| | | |
|---|---|---|
| IN RE: L.M.M., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., A/K/A J.M., FATHER | : | No. 602 WDA 2014 |

Appeal from the Order dated March 21, 2014,
Court of Common Pleas, Allegheny County,
Orphans' Court at No. TPR 160 of 2013

---

| | | |
|---|---|---|
| IN RE: A.L.M., MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.M., A/K/A J.M., FATHER | : | No. 603 WDA 2014 |

Appeal from the Order dated March 21, 2014,
Court of Common Pleas, Allegheny County,
Orphans' Court at No. TPR 159 of 2013

J-A29014-14
J-A29015-14


IN RE: P.R.M., A MINOR     : IN THE SUPERIOR COURT OF
               :    PENNSYLVANIA
               :
               :
               :
APPEAL OF: L.C.S., BIRTH MOTHER : No. 638 WDA 2014

Appeal from the Order March 21, 2014,
Court of Common Pleas, Allegheny County,
Orphans' Court at No. TPR 158 of 2013


IN RE: A.L.M., A MINOR     : IN THE SUPERIOR COURT OF
               :    PENNSYLVANIA
               :
               :
               :
APPEAL OF: L.C.S., BIRTH MOTHER : No. 639 WDA 2014

Appeal from the Order March 21, 2014,
Court of Common Pleas, Allegheny County,
Orphans' Court at No. TPR 159 of 2013


IN RE: L.M.M., A MINOR     : IN THE SUPERIOR COURT OF
               :    PENNSYLVANIA
               :
               :
               :
APPEAL OF: L.C.S., BIRTH MOTHER : No. 640 WDA 2014

Appeal from the Order March 21, 2014,
Court of Common Pleas, Allegheny County,
Orphans' Court at No. TPR 160 of 2013


BEFORE:  DONOHUE, ALLEN and STRASSBURGER*, JJ.


*Retired Senior Judge assigned to the Superior Court.

- 2 -

MEMORANDUM BY DONOHUE, J.:                    **FILED NOVEMBER 07, 2014**

Appellants, J.M. ("Father") and C.L.S. ("Mother"), appeal from the orders dated March 21, 2014, granting the petitions of Appellee, Allegheny County Children, Youth and Families ("CYF") to terminate their parental rights to PRM (born June 2007), ALM (born July 2010), and LMM (born March 2013).  For the reasons that follow, we affirm the trial court's orders.

On July 15, 2012, CYF took custody of PRM and ALM after receiving a report that the two children were found walking by railroad tracks.  Mother and Father each pled guilty to one count of endangering the welfare of a child, and on August 6, 2012, PRM and ALM were adjudicated dependent.  At the time of LMM's birth in March 2013, CYF immediately obtained an emergency custody authorization.  LMM was adjudicated dependent on March 27, 2013.

CYF established the following Family Service Plan (FSP) goals for Mother and Father: learn and use non-violent means of discipline, eliminate verbal and physical family abuse, maintain contact and cooperation with agency and service providers, address mental health issues, maintain safe and stable housing, address developmental delays and physical disabilities of the children, and maintain regular visits.  CYF referred Mother and Father to several service providers, including Achieva and Project Star, both of which

have expertise in helping parents and children with disabilities.[1] Mother and Father made substantial progress with respect to certain of the FSP goals. Father completed anger management classes and showed a marked improvement in managing his anger. N.T., 3/21/2014, at 141. An extermination service assisted with the housing issues. *Id.* at 142. Both Mother and Father achieved all of their visitation goals with the children and were extremely cooperative with both CYF and the assigned service providers. *Id.* A CYF caseworker testified that he had never met parents that were more cooperative and that their level of communication throughout the process was "unheard of." *Id.* at 141.

Nevertheless, after an evidentiary hearing on March 21, 2014, on March 31, 2014 the trial court issued orders terminating the parental rights of Mother and Father to the three children. In its written opinion in support of the orders, the trial court emphasized that for Mother and Father, "[i]t is a matter of 'cannot,' as opposed to 'will not,'" noting that "the issue is that the parents are intellectually impaired to such a degree that they are unable to provide care for the three children, all of whom have significant health concerns and special needs." Trial Court Opinion, 6/6/2014, at 4.

---

[1] PRM has a disorder on the autism spectrum reflecting pervasive developmental delays. N.T., 3/21/2014, at 33. ALM has muscular dystrophy and Charcot Marie Tooth Syndrome, both of which are degenerative disorders. *Id.* at 19, 199. LMM may also have muscular dystrophy and Charcot Marie Tooth Syndrome. *Id.* at 197-98. Mother has mild to moderate mental retardation. *Id.* at 7. Father has expressive language disorder and articulation disorder. *Id.* at 10.

On appeal, Father raises the following four issues for our consideration and determination:

> 1. Whether the trial court abused its discretion or erred as a matter of law in finding that [CYF] proved by clear and convincing evidence that they provided reasonable services to Father to reunify [him] with his children?
>
> 2. Whether the trial court abused its discretion or erred as a matter of law in finding that the conditions and causes of the incapacity, abuse, neglect, or refusal cannot or will not be remedied by Father?
>
> 3. Whether the trial court abused its discretion or erred as a matter of law in finding that Father was not likely to remedy the conditions which led to the removal of the children within a reasonable period of time?
>
> 4. Whether the trial court abused its discretion or erred as a matter of law in finding that termination of parental rights would best serve the developmental, physical, emotional needs and welfare of the children?

Father's Brief at 1-2.  Mother raises a single issue on appeal:

> 1. Did the trial court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the children pursuant to 23 Pa.C.S.A. § 2511(b).

Mother's Brief at 9.

When considering an appeal from a trial court's termination of parental rights, our standard of review is as follows:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.
>
> … [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826–27 (Pa. 2012) (citations omitted).

We begin with Father's first issue on appeal, in which he argues that CYF failed to provide "reasonable services" to reunify him with his children. Father's Brief at 6. Father does not contend that CYF failed to provide any

- 6 -

services to him, but rather that the services provided "were not specific enough to be meaningful to this family and in particular to Father," and that instead of helping, the services provided "were frustrating and confusing to the family." *Id.* at 6, 10. Father alleges that when he complained about his frustration with the services being provided, his concerns were not taken seriously and that he was accused of being belligerent and rude. *Id.* at 10.

Father did not preserve this issue for appeal, as it was not included in his statement of issues complained of on appeal filed pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure. As a result, it is waived. Pa.R.A.P. 1925(b)(4)(vii); *Cobbs v. SEPTA*, 985 A.2d 249, 256 (Pa. Super. 2009); *Southcentral Employment Corp. v. Birmingham Fire Ins. Co. of Pa.*, 926 A.2d 977, 983 n. 5 (Pa. Super. 2007) (holding that issue not raised in statement of matters complained of on appeal is waived for purposes of appeal).

Even if not waived, however, we would not grant relief on this basis. This Court recently reiterated a petitioner must make reasonable efforts to reunify a parent with his child prior to seeking to terminate a parent's rights. *In re D.C.D.*, 91 A.3d 173, 179 (Pa. Super.), *appeal grante*d, 93 A.3d 802 (Pa. 2014); *see also In re Adoption of R.J.S.*, 901 A.2d 502, 507 (Pa. Super. 2006) ("Before filing a petition for termination of parental rights, the Commonwealth is required to make reasonable efforts to promote reunification of parent and child."); *Fallaro v. Yeager*, 528 A.2d 222, 229

(Pa. Super. 1987) ("Ultimately, the goal is to rehabilitate the family, reunite the child with his family or, after reasonable efforts over an appropriate period of time have failed, to terminate parental rights and free the child for adoption[.]").

Based upon our review of the certified record, CYF met its obligation to provide reasonable efforts to reunify Father with his children. During permanency reviews in the dependency proceedings, the trial court repeatedly ruled that "[r]easonable efforts have been made by [CYS] to finalize this child's permanency plan."[2]  Moreover, the record reflects that CYF made referrals for multiple service providers, including Family Resources and the East Allegheny Family Support Center, which provided parenting services to both Mother and Father. N.T., 3/21/2014, at 132. With respect to Father's contention that the services provided to him were not specific enough to be meaningful to this family, the trial court found that the services provided by Achieva and Project Star are the best available in Allegheny County for the types of needs of the parents and children in this case. *Id.* at 222.  Dr. Angela Pepe ("Dr. Pepe"), a licensed clinical psychologist who evaluated and worked with both the parents and the

---

[2]  For ALM, the certified record contains four such Permanency Review Orders, dated November 21, 2012, February 21, 2013, June 10, 2013, and September 20, 2013. For PRM, the certified record contains three such orders (for reasons unclear, the docket does not contain a February 2013 Permanency Review Order for PRM). Due to her later birth, for LMM the certified record contains two such orders, dated June 10, 2013 and September 20, 2013.

children, testified that she recommended Achieva for Father because it provided interactive therapy services to help Father develop the ability to address his own, and his children's, special needs. *Id.* at 34. Colleen Sokira ("Sokira"), a parenting educational specialist at Achieva, testified that Achieva evaluated PRM's behaviors and provided Mother and Father with recommendations on how to best respond to them, establishing a clear routine for the parents to follow when working with him. *Id.* at 99-100. Finally, while Mother and Father initially voiced some frustration with what they considered to be conflicting advice from Achieva and Project Star (which was working with PRM), Sokira testified that the two agencies came together and concluded that while their advice was essentially the same, they were using different words to express the same recommendations. *Id.* at 107. After the two agencies came together and agreed on common verbiage, Mother and Father stopped expressing confusion, and in fact seemed to be more comfortable after seeing representatives from the two agencies communicating with each other before the beginning of visits with them. *Id.*

For his second issue on appeal, Father contends that CYF did not produce sufficient evidence to permit termination of his parental rights under 23 Pa.C.S.A. § 2511(a)(2). Section 2511 of the Adoption Act governs the termination of parental rights. *See* 23 Pa.C.S.A. § 2511. CYF bears the burden to prove, by clear and convincing evidence, that the asserted

grounds for termination are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). "[C]lear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.*

In this case, the trial court terminated Father's parental rights based upon section 2511(a)(1), (2), (5), (8) and (b), which state the following:

> **(a) General Rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> > (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
> >
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
> >
> > * * *
> >
> > (5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or

placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.** The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

Father contends that the trial court erred in finding that CYF had produced clear and convincing evidence to satisfy subsection 2511(a)(2).[3] Parental rights may be terminated under subsection 2511(a)(2) if three conditions are met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (citing *In re Geiger*, 331 A.2d 172, 174 (Pa. 1975)).

The grounds for termination of parental rights under section 2511(a)(2) are "not limited to affirmative misconduct." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002). Unlike subsection 2511(a)(1), subsection 2511(a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead focuses on the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being. *In re E.A.P.*, 944 A.2d at 82. Thus, while "sincere efforts to perform parental duties" can preserve parental rights under subsection 2511(a)(1), those same efforts may be insufficient to remedy

---

[3] Satisfaction of any one subsection of section 2511(a), along with consideration of section 2511(b), will suffice for the involuntary termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Because we conclude *infra* that CYF established sufficient grounds for termination of parental rights under subsection 2511(a)(2), we need not address Father's third issue on appeal, which challenges the sufficiency of the evidence under subsections 2511(a)(5) and 2511(a)(8).

parental incapacity under subsection 2511(a)(2). *In re Z.P.*, 994 A.2d

1108, 1117 (Pa. Super. 2010); *see also Matter of Adoption of C.A.W.*,

683 A.2d 911, 916 (Pa. Super. 1996); *In re Adoption of M.J.H.*, 501 A.2d

648 (Pa. Super. 1985).

In this case, the trial court, after an extensive review of the evidence

presented at the March 21, 2014 evidentiary hearing, found that Father,

despite genuine and diligent efforts to do so, could not obtain the necessary

parenting skills to allow for reunification with the children.

> One of the driving concerns which led to the children's removal was the parents' inability to properly supervise their children. [N.T., 3/21/2014], at 145. Even before the incident leading to the children's removal, there were previous reports made to the police concerning the lack of supervision. *Id.* at 156. 'Parenting' is a general term, as the caseworker suggested. *Id.* at 144. In this context, the 'parenting' goal, and consequently the crux of the case, revolved around the [parents'] abilities to address their own impairments while simultaneously addressing the rather extraordinary needs of their children. This Court agrees with CYF that this goal has not and cannot be met by the parents. *Id.*
>
> CYF recruited the assistance of Achieva, which is a large, private non-profit organization whose mission is to work with individuals with disabilities from birth to death. *Id.* at 70. Specifically, Achieva, and its service worker [Sokira], were asked to assess the parents' independent living and parenting skills and to supervise the children's visits at the Children's Institute. *Id.* Achieva attempted to provide the parents with additional parenting skills. The services began in May 2013. *Id.* at 71. But despite these services, the concerns about the parties' ability to

parent remained. [Sokira] testified that the primary and overarching issue during supervised visits is the parent's ability to identify what each and all of their children are doing at any given time. *Id.* at 74. After this initial identification, the question then becomes whether the respective child's activity is a health, safety or welfare concern. *Id.* Sokira testified that the parents could not make these diagnoses without a cue from the supporting staff. *Id.* That is, the parents were unable to identify dangerous situations. By way of example, Sokira testified that, during a visit, [PRM] started playing with the cords of a CD player that sat on a table. *Id.* at 75. The cord was wrapped around the child's neck, and the CD player was poised to fall on the child's head. *Id.* Achieva or Project Star staff would point out that [PRM] was playing with the CD player, but the parents lacked the ability to recognize the situation for what it was. *Id.* Not only do the parents have difficulty recognizing situations as hazardous, but they also lack the necessary skills to rectify the situation. *Id.* at 76.

Achieva sought to address this problem by helping the parents create a routine. *Id.* at 77. The routine was created with the hope that if the parents and the children knew what was supposed to be next, it would decrease the stress of the visit. *Id.* at 79. And if the children experienced less stress, then hopefully there would be less behavioral problems for the parents to have to address. *Id.* Sokira testified that, at the time of the hearing, there are less behavioral problems coming from the children, but that there are also more services being provided. *Id.* For example, [PRM] had his own behavior specialist consultant [Project Star]. *Id.* Still, both parents struggled throughout the visits directing the children what to do. *Id.* at 82. They would rather let the children be and then only engage with the children if the kids were having difficulty or if the staff prompted them to partake. *Id.* at 82-83. The problem with this approach is that if they cannot direct the children, the children will be harder for the

parents to supervise. *Id.* at 83-84. If the [parents'] cannot supervise, they cannot ensure that the children are safe. *Id.* at 103. Again, parental supervision was a primary concern if not the primary concern behind the removal of the children. Amanda Frey of Project Star, who also observed the visits, noted that the parents are often unaware when [ALM] would run off. *Id.* at 195. Sokira testified that on many visits, Father scrolled through his phone, not talking or paying attention to the children. *Id.* at 84-85. During other visits, Father wanted to discuss the court case with the staffers. The staff attempts to redirect Father were often fruitless. *Id.* at 85. Another reason the parents had trouble engaging with the children is because engagement requires verbal interaction and both parents have difficulty communicating. *Id.* at 87. When Achieva became involved with the parents. Father's verbal interactions consisted of repeating the child's name. *Id.* at 96, At the time of the [termination of parental rights] hearing, Father was able to give two and three word phrases to direct the children. *Id.* Given Father's inabilities, Sokira considered this development to be "significant progress. *Id.* at 97.

Though the parents communication, and thus their skillset has advanced somewhat, Sokira testified that it was still Achieva's conclusion that the parents do not have the ability to be aware of what all the children are doing at the same time. *Id.* at 87. This failure impedes the parents' ability to recognize danger or assess whether an activity is hazardous for the children. Even when the parents are cued in, they do not possess the ability to intervene. *Id.* at 88. The parents struggled to understand how to properly discipline the children. *Id.* at 119. They had difficulty understanding how to provide the children with the proper [instruction]. *Id.* at 118. Indeed there were still other concerns about the parties' ability to live independently. …

Trial Court Opinion, 6/6/2014, at 5-7.

The certified record on appeal supports the trial court's analysis, and thus we must conclude that no abuse of discretion occurred with respect to the trial court's finding that Father cannot remedy the conditions that led to the removal of the children from the home. CYF produced sufficient evidence to permit the termination of Father's parental rights pursuant to subsection 2511(a)(2).

For Father's fourth issue and Mother's only issue on appeal, both contest the trial court's finding that CYF met its evidentiary burden pursuant to section 2511(b), which requires consideration of whether the child's needs and welfare will best be met by termination of parental rights. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). This Court has described the nature of the analysis under section 2511(b) as follows:

> Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (internal citations and quotation marks omitted). A parent's own feelings of love and

affection for a child, alone, do not prevent termination of parental rights. *In re L.M.*, 923 A.2d 505, 512 (Pa. Super. 2007).

Both parents insist that termination of their parental rights is not in the best interests of the children. They argue that they have established (or, with respect to LMM, are establishing) strong bonds with the children, and that termination would unnecessarily result in a permanent loss of these bonds. Mother's Brief at 21; Father's Brief at 20. They insist that continued visitation with the children is the best course for all concerned, and thus the trial court, rather than terminating their parental rights, should have considered less drastic alternatives. Mother's Brief at 21; Father's Brief at 22. Father contends that the trial court should have placed the children in a permanent legal custodianship ("PLC"), which would have permitted the parents to retain their rights to continued visitation without requiring them to resume custody. Father's Brief at 22.

As indicated hereinabove, when contemplating the termination of parental rights, a trial court must consider whether terminating the natural parents' bond with their children "would destroy something in existence that is necessary and beneficial." *In re C.S.*, 761 A.2d at 1201. The mere existence of a bond or attachment of a child to a parent, however, is not outcome determinative and is instead just one of many factors that must be considered. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). One of these additional factors is whether the children are in a pre-adoptive home and

whether they have an emotional bond with their foster parents. *Id.* (citing *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012)).

In this case, Dr. Pepe testified that the children's primary attachment is with their foster parents, and that while with their foster parents, they have all made "tremendous progress" in dealing with their special needs. As a result, Dr. Pepe testified that given their ages, primary attachments to the foster parents, and developmental needs, termination of Mother's and Father's parental rights best serves the children's needs and welfare. N.T., 3/21/2014, at 29. Moreover, Dr. Pepe indicated that while a bond does exist between the children and their biological parents, if the children would never see them again they would likely only be "sad" for a period of time but it would not seriously impact their psychological functioning. *Id.* at 27, 56-57. Accordingly, the certified record supports the trial court's determination that termination of parental rights is in the best interests of the children, particularly given the unique facts presented here.

We likewise find no abuse of discretion in the trial court's decision not to place the children in a PLC. Based upon our review of the certified record, the trial court thoroughly reviewed the case, heard expert witnesses, and considered permanent legal custody as an option, but concluded that adoption best suits the developmental, physical and emotional needs of the children. To this end, the trial court specifically referenced the testimony of

Dr. Pepe regarding the children's need for the stability and permanency that

only adoption can provide them.

> It [adoption] provides the children with a level of stability that they need of knowing what to anticipate in the future. For example, what school they are going to go to, who their friends are going to be, what they can expect in their future. It is very important as opposed to being in limbo and not knowing how long is this going to last. … They have just a very high degree of insecurity without the level of permanency that I believe adoption offers them after a period of time. … Now, while a legal arrangement, for example, could occur until the children are 18, it doesn't have the same level of emotional reinforcement for the children. If they are able to comprehend that these are now my parents versus these are now my caregivers. … There is just a difference in their perception regarding the degree of stability that adoption provides.

N.T., 3/21/2014, at 54-55; Trial Court Opinion, 6/6/2014, at 10. The special

needs of the children take on added significance in the present

circumstances, as they will likely continue to require parental assistance

beyond the age of 18. N.T., 3/21/2014, at 19.

Finally, the trial court was influenced by Dr. Pepe's testimony that a

refusal to terminate the parental rights of Mother and Father would actually

have a negative effect on the children's long-term well-being, as the foster

parents are more capable of meeting the unique challenges presented here

and providing the necessary care for special needs children. Trial Court

Opinion, 6/6/2014, at 10 (citing N.T., 3/21/2014, at 38).

For these reasons, we find no abuse of discretion in the trial court's decision to terminate the parental rights of Mother and Father. This was an extremely difficult case fraught with the reality that the love and affection Mother and Father have for their children cannot overcome the stark fact that they are incapable of parenting their children, who have extraordinary needs. We commend the trial court for its thorough and thoughtful analysis of the situation and the needs and welfare of the children.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/7/2014