J-A07014-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: A.C., A MINOR

APPEAL OF: SOMERSET COUNTY CHILDREN & YOUTH SERVICES

IN THE SUPERIOR COURT OF PENNSYLVANIA

No. 1420 WDA 2014

Appeal from the Order entered July 24, 2014,
in the Court of Common Pleas of Somerset County, Orphans'
Court, at No(s): 14 Adoption 2013

BEFORE:  BENDER, P.J.E., LAZARUS, and MUNDY, JJ.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED MAY 11, 2015**

Somerset County Children and Youth Services ("CYS") appeals from the order entered July 24, 2014, in the Court of Common Pleas of Somerset County, which denied its petitions to terminate involuntarily the parental rights of D.P. ("Mother") and A.C. ("Father") to their minor son, A.C. ("Child").  After careful review, we reverse the subject order, and remand for the orphans' court to enter decrees terminating the parental rights of Mother and Father.

Child was born in February of 2012.  At the time of his birth, Child tested positive for oxycodone and methadone.  Both Mother and Father admitted to CYS that they took prescription drugs that had not been prescribed for them, and a safety plan was implemented.  On May 25, 2012, Mother and Father submitted to drug screens.  On May 31, 2012, CYS received the results of these screens, indicating that both parents tested positive.  That same day, CYS sought and received an order of protective

custody for Child. A dependency petition was filed on or about June 1, 2012, and Child was adjudicated dependent by order dated June 5, 2012.

On October 7, 2013, CYS filed petitions to terminate involuntarily the parental rights of Mother and Father. A hearing was held on July 14, 2014, during which the orphans' court heard the testimony of Psychologist Dennis Kashurba, CYS caseworker Andrea Palguta, CYS casework supervisor Teya Lopaze, Father, and Father's mother, P.C. (Grandmother). Mother failed to appear at the hearing.[1] On July 24, 2014, the court entered its order denying the termination petitions. CYS timely filed a notice of appeal on August 22, 2014, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

CYS now raises the following issues for our review.

I. Whether [CYS] proved by clear and convincing evidence at least one statutory ground for the termination of [] Father's parental rights[?]

> A. Whether the [orphans'] court erred as a matter of law, or abused its discretion by requiring [CYS] to show it made reasonable efforts to reunify [Child] with [] Father while incarcerated in order to meet its burden[?]
>
> B. Whether [CYS] proved by clear and convincing evidence that the termination of [] Father's parental rights would best serve the needs and welfare of [Child?]

---

[1] At the beginning of the hearing, Mother's counsel stated that he attempted to contact Mother, but was unable to reach her. N.T., 7/14/14, at 9-10.

II. Whether [CYS] proved by clear and convincing evidence at least one statutory ground [for] the termination of [] Mother's parental rights[?]

> A. Whether [CYS] proved by clear and convincing evidence that the termination of [] Mother's parental rights would best serve the needs and welfare of [Child?]

CYS's brief at 4 (orphans' court answers and unnecessary capitalization omitted).

We consider the claims presented by CYS mindful of our well-settled standard of review.

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory

- 3 -

grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In this case, CYS petitioned to terminate the parental rights of Mother and Father pursuant to Sections 2511(a)(1), (2), (5), (8), and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\*\*\*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or

will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\*\*\*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8), and (b).

In its opinion accompanying the subject order, the orphans' court concluded that CYS failed to present clear and convincing evidence that the parental rights of Father should be terminated under any of these sections. The court reasoned as follows, in pertinent part:

The removal of the Child [] from the parents on May 25, 2012, at a point in time when the Child was three months of age, resulted from a positive test for drugs … in violation of the

- 5 -

existing safety plan. Accordingly, the reunification plan consisted of the parents demonstrating that they were no longer dependent on drugs….

It is noteworthy that while Father's primary goal was to eradicate his involvement with drugs, he successfully completed an inpatient treatment program with the Cove Forge Treatment Center, and his successful completion was reported to agents of [CYS]. Although there were treatment recommendations assigned to Father upon his release, his incarcerations in early 2013 and subsequent sentence in the state corrections system made [] compliance with those treatment recommendations impossible.

As Father was removed from the ability to visit with his son and show meaningful progress towards the stated goals in the permanency plan, [CYS] failed to adapt its program goals consistent with an incarcerated parent. From that point forward the goals as to visitation with the child, attendance at medical appointments, maintaining stable employment, following treatment recommendations, and the like were meaningless because incarceration precluded pursuit of those goals. At that point in time [CYS] failed to adjust and monitor Father's progress based on the activities that he was capable of performing within the state corrections system. There are many programs within the state corrections system which focus on an inmate's post-release freedom from drug dependency as well as job skills, parenting skills, and other life skills, which would permit an inmate to become reunited with his minor children. [CYS] continued to measure Father's compliance with the plan and progress towards achievement of goals based on his conduct as if he was not incarcerated. While it might be argued as to whose duty it was to report Father's treatment progress within the state correction system, it simply wasn't done.

＊＊＊

If it is the role of [CYS] to promote the goal of reunification, it seems to the [c]ourt that when the parental goals focus on matters which only a parent out in the community can do, it is incumbent on [CYS] to modify the goals upon the incarceration of a parent to fit the reunification plan. Here, Father has completed drug and alcohol inpatient treatment and has furthered his drug abstinence through corrections

opportunities for AA, NA, substance abuse education, parenting skills and the like for which an inmate should be given credit in pursuit of his goals. [CYS] had little knowledge of Father's achievements during his incarceration and further was apparently unaware of his upcoming release from prison in September, 2014. Considering the original "circumstances that made placement necessary" centered on Father's positive drug screen and his duty to seek treatment and prove follow-up results, Father's success in inpatient drug treatment followed up by drug programs within the correction's system should have been reported to the Dependency Judge. These "successes" add up to demonstrate progress toward the goals that matter and for which Father has the capacity to complete.

Orphans' Court Opinion, 7/24/14, at 17-21 (unpaginated).

Notably, the court offered no discussion as to why it was denying the termination petition with respect to Mother. In its opinion pursuant to Pa.R.A.P. 1925(a), the court explained its decision not to terminate Mother's parental rights as follows:

[I]t is our position that the termination of parental rights, when posed against both birth parents, is ineffective to promote an adoption when the termination is not granted as to both parents. Under the circumstances where the court determines that the parental rights of one parent should be retained, as in the instant case, that parent may well go forward as the primary custodian of the child. As a result, where the parental rights of the other parent are still intact, the primary custodial parent should be in a position to pursue child support. At that point, the primary custodial parent is performing parental duties, perhaps to the exclusion of the other parent, and the family is no longer a burden to [CYS]. Assuming that the primary custodial parent is properly parenting the child, it is of little import to the court and to society that the noncustodial parent is nonfunctioning. Further, over time, as in the instant case, the other parent may overcome a drug dependency and thereafter become an appropriate and caring parent. Under this scenario, the time required by this noncustodial parent is not at the expense of [CYS] and may otherwise play out as needed during

when the custodial natural parent is appropriately providing all parental services.

The [c]ourt did not address the involuntary termination factors as to Mother because it determined that the rights should not be terminated as to Father…. The primary purpose of termination of parental rights proceedings is to achieve a position where an adoption can proceed. The statutory provision for termination are found under the general chapter heading of "Proceedings Prior To Adoption" which subdivision is under Title 23. Domestic Relations, Part III. Adoption.

Orphans' Court Opinion, 11/5/14, at 2-3 (unpaginated).

On appeal, CYS argues that the court abused its discretion by denying the termination petitions. CYS contends that it presented clear and convincing evidence to establish that the parental rights of both Mother and Father should be terminated, and that the court improperly required CYS to show that it made reasonable efforts to reunify Father with Child. CYS's brief at 12-25. We agree with CYS, and conclude that the orphans' court abused its discretion by refusing to terminate the parental rights of Mother and Father pursuant to Sections 2511(a)(8) and (b).

In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8), the following factors must be demonstrated: (1) The child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1275-76 (Pa. Super. 2003). "Notably, termination under Section 2511(a)(8), does not require an evaluation of [a parent's] willingness or ability to remedy the conditions that

led to placement of [the] children." ***In re Adoption of R.J.S.***, 901 A.2d 502, 511 (Pa. Super. 2006) (citations omitted).

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In ***In re C.M.S.***, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case.

***In re Adoption of J.M.***, 991 A.2d 321, 324 (Pa. Super. 2010) (some citations omitted).

> [W]hile both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing … Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

***In re C.L.G.***, 956 A.2d 999, 1009 (Pa. Super. 2008) (*en banc*).

Initially, we note that the court erred by declining to terminate Mother's parental rights simply because the parental rights of Father were being preserved. Our Supreme Court expressly rejected this proposition nearly 40 years ago in ***In re Burns***, 379 A.2d 535, 541 (Pa. 1977) ("Nothing in the Adoption Act requires that an agency, which has assumed custody of a child, must establish grounds for the involuntary termination of both parents, before it can obtain such a decree as to either."). While

*Burns* was decided under a prior version of the Adoption Act, nothing in the current Act contradicts the Court's decision. Indeed, as acknowledged by the orphans' court, this Court more recently reached a similar result in *In re C.W.U., Jr.*, 33 A.3d 1 (Pa. Super. 2011). In that case, a trial court "conceded that it refused to terminate Father's parental rights because the court did not wish to leave Child without a father, in light of the fact that it was not terminating Mother's parental rights at this time." *Id.* at 9. This Court reversed, holding that there was no competent evidence to support the trial court's decision. *Id.*

Additionally, as explained *infra*, the evidence presented by CYS in this matter overwhelmingly supported the termination of both parents' parental rights. During the hearing, Ms. Andrea Palguta testified that she was the CYS caseworker assigned to this matter from January 30, 2012, prior to Child's birth, until January 5, 2013. *Id.* at 34-35, 43. Ms. Palguta explained that, as a result of Child's adjudication of dependency, Mother and Father were ordered to, *inter alia*, "complete drug and alcohol evaluations; comply with whatever treatment recommendations came from that evaluation; … complete random drug screens and to give at least three consecutive negative drug screens …." *Id.* at 42-43. Ms. Palguta stated that both Mother and Father completed drug and alcohol evaluations. *Id.* at 43-44. However, they did not comply fully with the recommended treatment. *Id.* at 44. Ms. Palguta noted that, between the September 4, 2012 permanency

review hearing and the November 6, 2012 permanency review hearing, Father reported to CYS that that he was receiving drug treatment from a "Dr. Cober," and that he "was going to enter a 90-day drug and alcohol treatment program in Harrisburg, but … we received no verification that he ever did that." *Id.* at 52-53.

Additionally, during Ms. Palguta's time on the case, neither parent had three consecutive negative drug screens. *Id.* at 44, 58-59. Ms. Palguta explained that at least seven drug screens would have been requested from Mother during her time as the caseworker. *Id.* at 62-63. Of those seven tests, Mother provided four samples and tested positive three of those four times. *Id.* at 63. Ms. Palguta stated that Father at one point refused a drug screen, and that there were "other times" when the parents admitted to using drugs. *Id.* at 50. Specifically, Mother admitted to using another person's Percocet on July 10, 2012. *Id.* Father refused a drug screen that same day "stating that he could not product [*sic*] any urine because of severe dehydration from diarrhea." *Id.* Finally, Ms. Palguta testified that Child appeared very comfortable with his foster family. *Id.* at 66. She noted that, when Child would not see Father for a long period of time, he developed "kind of a stranger anxiety around him." *Id.* Child appeared "fairly comfortable" with Mother. *Id.* at 67.

Ms. Teya Lopaze testified that she is a casework supervisor for CYS, and that this case "was assigned to a caseworker in my unit in January of …

2013." *Id.* at 68. Ms. Lopaze explained that, from the time she had the case until the time the termination petitions were filed, neither parent submitted three consecutive negative drug screens. *Id.* at 70, 87. Father did complete drug treatment in 2012. *Id.* at 71, 95. However, Ms. Lopaze noted that, when Father was discharged, "it was recommended that he do intensive outpatient counseling, attend 90 AA/NA meetings within 90 days of discharge, [and] retain a sponsor within three to five days of discharge …." *Id.* at 95. To her knowledge, Father did not complete these recommendations. *Id.* at 97-98.

Ms. Lopaze further explained that Mother completed a drug evaluation at Twin Lakes in March of 2013, but that CYS did not receive any confirmation that Mother completed the recommended drug treatment. *Id.* at 71, 87. The last drug screen administered to Mother took place on April 2, 2013. *Id.* at 79. Mother tested positive for opiates and cocaine. *Id.* Ms. Lopaze stated that CYS was not able to administer additional drug screens to Mother because, following her final visit with Child on June 11, 2013, "she has not made herself available. We didn't even know her whereabouts." *Id.* at 79-80, 83. At the time of the termination hearing, Ms. Lopaze still did not know where Mother was. *Id.* at 87. Ms. Lopaze noted that Child is doing well in foster care. *Id.* at 69. She opined that it would be in Child's best interest for the parental rights of Mother and Father to be terminated. *Id.* at 88-89.

Psychologist Dennis Kashurba testified as an expert in bonding studies between parents and their children. N.T., 7/14/14, at 12-14. Mr. Kashurba explained that he was unable to observe the Child with Father or Mother, as Father was incarcerated, and Mother failed to appear for her scheduled visit. *Id.* at 16. However, Mr. Kashurba noted that the bond between Child and his foster parents "seems to be quite appropriate," and that the foster home was "more than adequate." *Id.* at 18. Mr. Kashurba stated that Child had been in the foster home since he was approximately three months old, and that he would view his foster parents as his "mom and dad." *Id.* at 19. Mr. Kashurba opined that it would be a detriment to Child's development to remove him from his current placement. *Id.* at 21. Mr. Kashura further opined that the parental rights of Mother and Father should be terminated, and that this would not have a negative impact on Child. *Id.* at 21. Mr. Kashurba noted that he has "no information to suggest" that Child has a bond with either Father or Mother, and that it is unlikely that the parents will be able to develop a parent/child relationship with Child within a reasonable amount of time.[2] *Id.* at 20-25.

Father, who still was incarcerated at the time of the hearing and testified by phone, indicated that he has criminal records in seven Pennsylvania counties: Allegheny, Blair, Cambria, Fayette, Indiana,

---

[2] In his psychological bonding study, admitted during the hearing as Exhibit F, Mr. Kashurba reported that Child's foster father "reiterated that he and his wife wish to be considered as adoptive parents for [Child] …." Exhibit F at 4.

Somerset, and Westmoreland. *Id.* at 114.[3] Father has been convicted of a variety of criminal offenses, including retail theft, fleeing and eluding police, simple assault, tampering with evidence, criminal trespass, public drunkenness, disorderly conduct, possession of drug paraphernalia, and drug possession. *Id.* at 114-18. Father also conceded that he has a drug problem. *Id.* at 119. According to Father, he previously completed a drug rehabilitation program, which he attended from "November -- I believe 13th to early December" of 2012. *Id.* at 105, 113. Father claimed that "somehow CYS contacted the Welfare Office and had my insurance terminated," and that these "insurance issues" prevented him from getting into treatment sooner. *Id.* at 110, 112. Father admitted that he failed to complete the recommended follow-up treatment, but insisted that "[w]e don't have 90 and 90 in Johnstown," and that he did the best he could by attending four Narcotics Anonymous and/or Alcoholics Anonymous meetings per week. *Id.* at 119. Father was incarcerated shortly after he completed treatment, "in the beginning of January." *Id.* at 113. Father's last visit with Child took place in October of 2012, and lasted five minutes. *Id.*

Father further testified that he participated in "the therapeutic community while incarcerated here, which is another alcohol and drug treatment," and that he also attends Narcotics Anonymous, Alcoholics Anonymous, and "Smart Recovery" meetings on a weekly basis, as well as

---

[3] Father neglected to mention his prior conviction in Cumberland County, which would bring the total to eight. N.T., 7/14/14, at 117.

parenting classes. *Id.* at 105-06. Father indicated that he would be released from incarceration on approximately September 10, 2014, and that he would immediately report to a "Community Correction's Residency Center for alcohol and drug treatment, which can range anywhere from 14 to 90 days." *Id.* at 105, 123-25.

Grandmother testified that Father loves Child, and that she would assist Father in caring for Child upon his release. *Id.* at 134-35. Grandmother conceded that Father has a drug problem, that he has been in rehabilitation programs "[m]ultiple times," and that he continues to relapse. *Id.* at 138.[4]

Accordingly, the record confirms that CYS presented clear and convincing evidence to support the termination of both parents' parental rights. With respect to Section 2511(a)(8), Child was removed from the care of Mother and Father on May 31, 2012. At the time of the July 14, 2014 termination hearing, Child had been in the custody of CYS for over two years. As acknowledged by the orphans' court, Child was removed due to drug use, and it was incumbent on both parents to remedy this problem, or at least get it under control, in order to regain custody of Child. Neither parent did so. Mother's final drug test with CYS, which took place on April 2,

---

[4] Grandmother also testified that she considered acting as a kinship placement for Child. N.T., 7/14/14, at 133. Following Grandmother's testimony, Ms. Palguta and Ms. Lopaze were recalled as witnesses, and testified concerning CYS's consideration of Grandmother as a possible kinship placement. *Id.* at 145-49.

2013, was positive for opiates and cocaine. While Mother underwent a drug evaluation at Twin Lakes, CYS did not receive any confirmation that she completed drug treatment. The record is simply devoid of evidence that Mother remedied the conditions which resulted in Child's placement.

Similarly, Father admitted during the hearing that he has a drug problem. While Father completed an inpatient drug treatment program in late 2012, Father did not complete the recommended follow-up treatment, including intensive outpatient counseling, prior to his incarceration. Moreover, the record does not suggest that Father was able to complete adequate, or equivalent, drug treatment during his time as an inmate. To the contrary, Father testified that he was going to be released from incarceration directly into a facility where he would receive an additional 14 to 90 days of treatment. Thus, at the time Father received notice of the termination petition in this matter, he too had failed to remedy the conditions which resulted in Child's placement.

Additionally, it would best serve the needs and welfare of Child to terminate the parental rights of Mother and Father. Child is doing well with his foster family, which has cared for and bonded with Child for years. In contrast, Mother and Father have spent a significant portion of this time incarcerated, or otherwise absent from Child's life. Father in particular appears to be incorrigible, as he has an 18-year criminal history spanning numerous Pennsylvania counties. As this Court has stated, "a child's life

cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." ***In re Adoption of R.J.S.,*** 901 A.2d 502, 513 (Pa. Super. 2006).

With respect to Section 2511(b), it is apparent that Child has little, if any, bond with his parents. Child was removed from his parents' care when he was about three months old. At the time of the termination hearing, Child had not visited with Mother since June of 2013, and Child had not visited with Father since October of 2012. Mr. Kashurba testified that it would not be detrimental to Child if the parental rights of Mother and Father were terminated. Mr. Kashurba opined, however, that Child would suffer harm if removed from his current foster placement.[5] Again, it is abundantly clear that termination would best serve the needs and welfare of the Child.

While the orphans' court observes that CYS did not adjust Father's reunification goals to accommodate his incarceration, nothing in the Adoption Act supports the court's position. Notably, in its opinion

---

[5] The orphans' court did not address Section 2511(b), except to state in its opinion pursuant to Pa.R.A.P. 1925(a) that it placed "little weight" on Mr. Kashurba's testimony because, *inter alia*, Mr. Kashurba "did not have any basis with which to evaluate the natural parent bonding inasmuch as [F]ather was incarcerated and [M]other's whereabouts were unknown." Orphans' Court Opinion, 11/5/14, at 3. To the extent the orphans' court concluded that termination would not be in Child's best interest, we conclude that the court abused its discretion by reaching a decision that was unreasonable and unsupported by evidence of record.

accompanying the subject order, the orphans' court discussed and relied upon **In re D.C.D.**, 91 A.3d 173, 179 (Pa. Super. 2014), *reversed*, 105 A.3d 662 (Pa. 2014), in which a panel of this Court stated that an agency must first make reasonable efforts to reunify a parent with his or her child before filing a petition to terminate parental rights. **D.C.D.** recently was reversed by our Supreme Court. We have discussed the Supreme Court's decision as follows:

> In **In re D.C.D.**, 105 A.3d 662 (Pa. 2014), our Supreme Court analyzed the language of Section 2511(a)(2) of the Adoption Act, as well as Section 6351 of the Juvenile Act, 42 Pa.C.S.A. § 6351. The Court reasoned that, while "reasonable efforts may be relevant to a court's consideration of both the grounds for termination and the best interests of the child," neither of these provisions, when read together or individually, requires reasonable efforts. The Court also concluded that reasonable efforts were not required to protect a parent's constitutional right to the care, custody, and control of his or her child. While the Supreme Court in **D.C.D.** focused its analysis on Section 2511(a)(2), we find the Supreme Court's reasoning equally applicable to Section 2511(a)(8). Like Section 2511(a)(2), nothing in the language of Section 2511(a)(8) suggests that reasonable reunification services are necessary to support the termination of parental rights.

**In re Adoption of C.J.P.**, 2015 WL 1668310 at *7, 2015 Pa. Super. LEXIS 181 at *21 (Pa. Super. 2015) (some citations omitted).

Critically, our Supreme Court in **D.C.D.** observed that "the remedy for an agency's failure to provide services **is not to punish an innocent child, by delaying her permanency through denying termination**, but instead to conclude on the record that the agency has failed to make reasonable efforts …." 105 A.3d at 675 (citations omitted, emphasis added). Here, the

- 18 -

orphans' court's opinion reveals that it did precisely what our Supreme Court has instructed that courts should not do, *i.e.*, not giving due regard to Child for the perceived failings of CYS.

Accordingly, because we conclude that the orphans' court abused its discretion by denying CYS's petitions to terminate the parental rights of Mother and Father, we reverse. We remand this matter for the orphans' court to enter decrees terminating the parental rights of both Mother and Father pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b).

Order reversed. Case remanded for further proceedings consistent with this Memorandum. Jurisdiction relinquished.

Judge Mundy joins this memorandum.

Judge Lazarus files a concurring statement.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/11/2015

- 19 -