J-S55008-20

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| IN THE INTEREST OF: X.L.A. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: L.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 756 WDA 2020 |

Appeal from the Order Entered June 29, 2020
In the Court of Common Pleas of Lawrence County Orphans' Court at
No(s):  No. 20008 of 2020 O.C.-A

| | | |
|---|---|---|
| IN THE INTEREST OF: X.L.A. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: L.A., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 757 WDA 2020 |

Appeal from the Order Entered June 30, 2020
In the Court of Common Pleas of Lawrence County Family Court at
No(s):  No. 24 of 2017, D.P.

BEFORE:   BOWES, J., McCAFFERY, J., and COLINS, J.[*]

MEMORANDUM BY BOWES, J.:                    FILED JANUARY 06, 2021

L.A. ("Father") appeals from the June 29, 2020 orphan's court order granting the petition filed by Lawrence County Children and Youth Services ("LCCYS") to involuntarily terminate Father's parental rights to his son, X.L.A. He also appeals the June 30, 2020 juvenile court order that changed X.L.A.'s

_____

[*] Retired Senior Judge assigned to the Superior Court.

permanent placement goal from reunification to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.[1]  We affirm.

The trial court summarized the procedural and factual history in the underlying order terminating parental rights as follows:

### FINDINGS OF FACT

. . . .

3. [X.L.A., born in September 2016,] came into the care of [LCCYS] on April 10, 2017 when Natural Father was taken into custody for a parole violation stemming from his use of cocaine. At that time [R.O.,] Natural Mother[,] was unavailable to care for [X.L.A.] because she was incarcerated at the Beaver County Jail and no other caregiver was available to care for [X.L.A.].  Natural Father has remained incarcerated since April 10, 2017, with a current max date of April 10, 2021.  Natural Father indicated that a hearing scheduled for August 28, 2020 could result in an earlier max out date.

4. [X.L.A.] has been in the sole continuous custody of Lawrence County Children and Youth Services since April 10, 2017.

5. On April 24, 2017, [X.L.A.] was adjudicated dependent[;] the docket reflects that Natural Father was present at the hearing. This was [the] last hearing [that] Natural Father participated in until the termination hearing held on today's date.  Natural Mother did not appear at the hearing.

6. [X.L.A.] is currently placed in a pre-adoptive foster home where he is thriving.

. . . .

10. Natural Father never signed a child permanency plan. Nevertheless, Father's child permanency plan had six (6) goals: (1) cooperate with the Agency; (2) secure and maintain a stable, appropriate residence; (3) have a mental health evaluation and follow all recommended treatments; (4) have a drug and alcohol assessment and follow through with any recommended

_____

[1] This Court consolidated the appeals sua sponte.

treatments; (5) complete a parenting class; and (6) submit to Agency requests for drug screenings. The Agency admitted that the second, third, fourth and sixth goals were impossible for Natural Father to comply with while incarcerated and indicated that those four goals would apply upon [his] release from incarceration.

11. Natural Father's progress as to the child permanency plan is as follows: (1) Natural Father had minimal communication with the Agency, the extent of his communication consisted of three letters and one phone call from an individual purporting to be Natural Father's girlfriend. At best, Father has participated in two hearings during the life of this case, the adjudication hearing and the subject termination hearing; [goals (2) through (4) and goal (6) were only applicable upon Natural Father's release from incarceration]; (5) Natural Father was on a waiting list for a parenting class for approximately a year but was moved to a new state correctional facility before he could begin the class[.]

12. Natural Father never requested visits with [X.L.A.] and the only time he contacted the Agency regarding the well-being of the child was around September 22, 2017[,] when he inquired as to whether [X.L.A.] had been moved. Natural Father failed to notify the Agency when he was transferred from SCI Camp Hill to SCI Mercer, which transfer happened in excess of a year ago. From the date of the Adjudication Hearing on April 24, 2017, Natural Father only sent [X.L.A.] one letter and possibly one card. Natural Father admitted he has made no attempts to contact [X.L.A.] since he was transferred to SCI Mercer.

13. [X.L.A.] was less than 7 months old when the [f]ather was arrested and [X.L.A.] was placed in the care of Lawrence County Children and Youth Services. [X.L.A.] is now 3 years 9 months of age and has been in what is now a pre-adoptive foster home for 3 years and 2 months. [X.L.A.] is thriving with this family and it is in the best interest of [X.L.A.] to remain with the foster parents.

Order, 6/29/20, at 1-3 (unnecessary capitalization omitted).

On February 24, 2020, LCCYS filed a petition for the involuntary termination of parental rights of Father pursuant to 23 Pa.C.S. § 2511(a)(1),

- 3 -

(5), (8), and (b).[2]  During the ensuing hearing, Father, represented by counsel, participated via telephone from SCI-Mercer, and testified on his own behalf.  Child was represented by a legal interests counsel as well as a guardian ad litem.[3]  Legal interests counsel offered no position as to termination of Father's parental rights, stating, "Your Honor, [X.L.A.] is only three and a half years old and I was unable to ascertain what position he has in this matter."  N.T., 6/24/20, at 53.  The guardian ad litem argued in favor of terminating Father's parental rights.  Id.

Subsequent to the hearing, the trial court entered the above-referenced orders terminating Father's parental rights, and changing X.L.A.'s permanent placement goal to adoption.  Father filed timely notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Father raises the following issues for our review:

> 1.  Whether the lower court erred in finding that Lawrence County Children and Youth Services proved by clear and convincing evidence that sufficient grounds existed to terminate the parental rights of Natural Father[?]

_____

[2] On June 29, 2020, the trial court confirmed Mother's consent for voluntary termination of her parental rights.  It also approved a post-adoption contact agreement, between Mother and the pre-adoptive foster parents, that permits Mother to visit X.L.A. twice per year.  See N.T., 6/24/20, at 17.

[3] See In re Adoption of L.B.M., 161 A.3d 172, 175, 180 (Pa. 2017) (pursuant to 23 Pa.C.S. § 2313(a), a child who is the subject of a contested involuntary termination proceeding has a statutory right to counsel who discerns and advocates for the child's legal interests, defined as a child's preferred outcome).

- 4 -

2.      Whether the lower court erred in not finding that Lawrence County Children and Youth Services failed to provide Natural Father with reasonable efforts to promote reunification with the minor child[?]

3.      Whether the lower court erred in finding Natural Father by conduct continuing for a period of at least six months immediately preceding the filing of the petition has evidenced a settled purpose of relinquishing his parental rights to the minor child and has refused and failed to perform parental duties[?]

4.      Whether the lower court erred in finding that the conditions which led to the removal of the child continue to exist, Natural Father cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to Natural Father are not likely to remedy the conditions which led to the removal of the child within a reasonable period of time[?]

5.      Whether the lower court erred in finding that it is in the best interest of the minor child that the goal be changed to adoption[?]

Father's brief at 7-8 (numbering added).[4]  Neither the guardian ad litem nor LCCYS filed a brief.  Legal counsel filed a letter with this Court advising that he had no position because three-year-old X.L.A. was not able to communicate a preference.

In matters involving the involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record."  In re Adoption of S.P., 47 A.3d 817, 826 (Pa. 2012).  "If the factual findings are supported, appellate courts

_____

[4] We observe that Father states some of his issues differently than he originally framed in his Rule 1925(b) statement and he abandoned other issues that he initially presented.  Nevertheless, we find that Father preserved the arguments that he presents in his brief with respect to § 2511(a)(1) and the goal change.

review to determine if the trial court made an error of law or abused its discretion." Id. "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." Id. The trial court's decision, however, should not be reversed merely because the record would support a different result. Id. at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. See In re R.J.T., [9 A.3d 1179, 1190 (Pa. 2010)].

In re T.S.M., 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." In re M.G. & J.G., 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).

The termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

Our case law has made clear that under [§] 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

In re L.M., 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear

conviction, without hesitance, of the truth of the precise facts in issue." In re C.S., 761 A.2d 1197, 1201 (Pa.Super. 2000) (quoting Matter of Adoption of Charles E.D.M., II, 708 A.2d 88, 91 (Pa. 1998)).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (5), (8), and (b). In order to affirm the termination of parental rights, we need only agree with the trial court as to any one subsection of § 2511(a), as well as § 2511(b). See In re B.L.W., 843 A.2d 380, 384 (Pa.Super. 2004) (en banc). Here, we analyze the court's termination order pursuant to § 2511(a)(1) and (b), which provide as follows:

> (a) General rule.--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>>
>> . . . .
>
> (b) Other considerations.--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We have explained this Court's review of a challenge to the sufficiency of the evidence to support the involuntary termination of a parent's rights pursuant to § 2511(a)(1) as follows:

> To satisfy the requirements of [§] 2511(a)(1), the moving party must produce clear and convincing evidence of conduct, sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties. In addition,
>
>> Section 2511 does not require that the parent demonstrate both a settled purpose of relinquishing parental claim to a child and refusal or failure to perform parental duties. Accordingly, parental rights may be terminated pursuant to Section 2511(a)(1) if the parent either demonstrates a settled purpose of relinquishing parental claim to a child or fails to perform parental duties.
>>
>> Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

In re Z.S.W., 946 A.2d 726, 730 (Pa.Super. 2008) (internal citations omitted) (emphasis added).

As it relates to the crucial six-month period prior to the filing of the petition, this Court has instructed:

> [I]t is the six months immediately preceding the filing of the petition that is most critical to our analysis. However, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provisions, but instead consider the individual circumstances of each case.

In re D.J.S., 737 A.2d 283, 286 (Pa.Super. 1999) (citations omitted). This requires the court to "examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." In re B., N.M., 856 A.2d 847, 855 (Pa.Super. 2004).

Furthermore, we have stated:

[T]o be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

In re Z.P., supra at 1119 (citation omitted); see also In re Adoption of C.L.G., 956 A.2d 999, 1006 (Pa.Super 2008) (en banc).

Regarding the definition of "parental duties," this Court explained:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this Court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with . . . her physical and emotional needs.

In re B., N.M., supra at 855 (cleaned up).

Incarceration does not relieve a parent of the obligation to perform parental duties. An incarcerated parent must "utilize available resources to continue a relationship" with his or her child. In re Adoption of S.P., 47 A.3d 817, 828 (Pa. 2012) (discussing In re Adoption of McCray, 331 A.2d 652 (Pa. 1975)).

Father argues that the orphans' court erred in finding that LCCYS established that Father evidenced a settled purpose to relinquish his parental rights. He further asserts that LCCYS failed to make reasonable efforts towards reunification of Father and X.L.A. Father frames these arguments as follows:

[LCCYS] must make reasonable efforts to reunify a parent with a child prior to filing a petition to terminate a parent's rights. [In the Interest of D.C.D., Minor, 91 A.3d 173 (Pa.Super 2014)]. There is no exception to that requirement simply because the parent is incarcerated. [Id.] The lower court erred in not finding that [LCCYS] failed to provide reasonable efforts in which to promote reunification between [Father] and his child. Actions by an agency directed at preventing the preservation of the parental relationship cannot be tolerated. [In re: Adoption of M.S., 664 A.2d 370 (Pa.Super. 1995)]. The record in this case

clearly evidences that [LCCYS] failed to make reasonable efforts to reunify [Father] with his minor child.

The caseworker admitted during her testimony that the goals of housing, mental health evaluation and drug testing "wouldn't apply" due to [Father's] incarceration. The caseworker never reviewed any of the [Child Permanency Plans ("CPPs")] with [Father], never confirmed [Father] received the CPPs, never explained to [Father] he could visit with his son while incarcerated, and never specifically explained that he could [send correspondence] and [advise] where to send cards, gifts and letters.

[Father] did not evidence a settled purpose to relinquish his rights. He was limited due to his incarceration. [Father] notified [LCCYS] that he intended to regain custody of his son upon his release from incarceration. He has a plan upon his release from incarceration. [LCCYS] created a child permanency plan and included elements with full knowledge that [Father] could not comply with those elements while incarcerated. [LCCYS] then proceeded to file a termination of [Father's] parental rights based upon their allegations that [Father] failed to comply with the elements of the CPP. The evidence clearly shows that [LCCYS] did not make reasonable efforts to reunify [Father] with his child prior to filing the petition for termination of parental rights. The lower court ignored the testimony of the caseworker which admits [LCCYS's] failure to make reasonable efforts to reunify. [LCCYS] is not relieved of making reasonable efforts or offering reasonable services to assist an incarcerated parent with meeting the goals of the CPP. The caseworker failed to even meet with [Father] either in person or by telephone. [LCCYS] failed to take steps to ensure [Father] received the CPP, understood the goals of the CPP and [Father] failed to inquire what [Father] could or could not do to meet the goals while incarcerated.

Father's brief at 16-18 (citations to record omitted).

Our review of the certified record supports the trial court's decision to terminate Father's parental rights pursuant to § 2511(a)(1). First, Father misstates the significance of LCCYS's alleged failure to demonstrate reasonable efforts to reunite the family. Indeed, our Supreme Court rejected

the argument that the provision of reasonable efforts is an element that an agency must satisfy in order to terminate parental rights. See In the Interest of: D.C.D., 105 A.3d 662, 672 (Pa. 2014). While the High Court recognized that an agency cannot deny a parent services and then condemn him or her for a lack of progress in an area the services would have addressed, the exertion of reasonable efforts is not a statutory prerequisite to the severing parental rights under the Adoption Act. Id. ("Neither subsection (a) nor (b) requires a court to consider the reasonable efforts provided to a parent prior to termination of parental rights."). Thus, contrary to Father's protestations, our review does not include an evaluation of the agency's efforts beyond the possible explanation for his lack of progress in a given area.

Instantly, Father presents the bare assertion that the orphans' court "erred in not finding that [LCCYS] failed to provide reasonable efforts in which to promote reunification between [Father] and his child." Father's brief at 16. Critically, however, Father's argument acknowledges that while LCCYS neglected to provide him several services relating to housing, mental health, and drug testing, the agency did not expect him to attain any goals relevant to those areas, which it deemed inapplicable due to Father's incarceration. Essentially, Father was asked to cooperate with the agency, which the LCCYS caseworker indicated Father failed to do despite her effort to maintain contact with him. See e.g., N.T., 6/24/20, at 20 ("I have had very little communication with him. I have sent him numerous letters, however, he has

only contacted me three times. One of which was by his girlfriend."); id. at 22-23, 32 (to caseworkers knowledge, Father did not participate in periodic permanency review hearings, request visitations with X.L.A., ask about the child's wellbeing, or contact the foster parents). Hence, the circumstances of this case do not implicate the concerns that our High Court noted in In the Interest of: D.C.D., supra at 672, regarding the agency's reliance upon the lack of services as justification for terminating parental rights. Hence, Father's claim is without merit.

Furthermore, while Father argues that LCCY failed to establish that he evidenced a settled purpose to relinquish his parental rights, he discounts his failure to perform parental duties since his incarceration, a period of over two and one-half years at the time of the hearing. As indicated supra, incarceration does not relieve a parent of the obligation to perform parental duties. Indeed, an incarcerated parent must "utilize available resources to continue a relationship" with his or her child. In re Adoption of S.P., supra at 828.

Father has been incarcerated since X.L.A. was seven months old. N.T., 6/24/20, at 18-19. LCCYS caseworker Amber Pieri testified that, during Father's incarceration, he was unable to complete several aspects of the service plan, which it deemed inapplicable. Id. at 20, 26-27. She acknowledged that Father completed programs on victim awareness and violence prevention and attended the Liberty Alliance Community Program

- 13 -

that was administered by the correctional facility's drug and alcohol department. Id. at 22. Likewise, Father testified that he participated in a volunteer program called Seeking Safety, which he described as a drug and mental health class, but he was unable to complete it because of his transfer from SCI-Camp Hill to SCI Mercer. Id. at 40. In addition, Father was on the waiting list for a parenting class at both SCI-Camp Hill and SCI Mercer. Id.

Notwithstanding Father's efforts to utilize some of the services available to him in prison, Father neglected his foremost obligation to his son in this situation, i.e., maintaining some form of communication. Father never requested visitation with X.L.A. and only inquired once of Ms. Pieri regarding his son, specifically X.L.A.'s location, around September 2017. Id. at 23, 27-28, 30, 35. Moreover, Father only sent one letter and one birthday card for X.L.A. Id. at 31, 44-48. Moreover, Father confirmed Ms. Pieri's testimony that he did not send any cards, notes, gifts, or drawings to and made no contact with the foster family. Id. at 23, 31, 44. While Ms. Pieri conceded that she did not specifically advise Father that he could request visitation with his son at the prison, she encouraged Father to send cards and letters, and she provided to Father the agency's address and telephone number as well as the address and telephone number of Father's attorney. Id. at 34. Likewise, X.L.A.'s address at the foster home was included in the Child Permanency Plans. Id.

In sum, during the three years that X.L.A. has been in LCCY's placement, Father participated in select prison programs and mailed his son one letter and one card. Apparently dissatisfied with the degree of assistance provided by LCCY and disappointed that he did not receive a response from the agency or the foster parent's following his initial efforts, he ceased correspondence. As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." In re Adoption of R.J.S., 901 A.2d 502, 513 (Pa.Super. 2006). This is precisely what Father asked of the orphans' court in the case at bar. As clear and convincing evidence supports the trial court's termination pursuant to § 2511(a)(1), we find no abuse of discretion. See In re T.S.M., supra at 267; In re Adoption of T.B.B., supra at 394. Hence, we affirm the orphans' court order termination Father's parental rights pursuant to § 2511(a) and (b).[5]

_____

[5] As Father does not challenge the orphans' court's decision relevant to § 2511(b), we do not address the court's needs and welfare analysis beyond highlighting that the record confirms the absence of a meaningful parent-child bond insofar as: (1) Father has not interacted with his son since April 2017, when the child was seven month old; and (2) X.L.A. is thriving in his pre-adoptive foster home. N.T., 6/24/20, at 32-33, 49.

Finally, to the extent that Father's argument challenging the goal change remains justiciable in light of our decision to affirm the termination of his parental rights, see Interest of D.R.-W., 227 A.3d 905, 917 (Pa.Super. 2020) ("even if Father had not waived his goal change claim, it would be moot in light of our decision to affirm the court's termination decrees"), the assertion is waived because Father failed to develop it in his brief. See In re W.H., 25 A.3d 330, 339 n.3 (Pa.Super. 2011) (quoting In re A.C., 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.").

Instantly, without citation to any case law that is pertinent to goal changes or reference to the section of the Juvenile Act that govern permanency plans and placement goals, i.e., 42 Pa.C.S. § 6351, Father baldly concludes, "The lower court erred in not finding that Appellee failed to provide Appellant with reasonable efforts to promote reunification and as such erred in finding that it is in the best interest of the minor child that the goal be changed to adoption." Father's brief at 18. As Father failed to support this ambitious assertion with any relevant legal argument, it is waived.[6]

_____

[6] Even if Father had preserved this issue, we would find it fails for the reasons indicated above with regard to 23 Pa.C.S. § 2511(a)(1) and (b). Stated plainly, the record establishes that the goal change served the best interests of X.L.A.

For all of the foregoing reasons, we affirm the orphans' court order that terminates Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1) and (b), and the juvenile court order that changes X.L.A.'s permanent placement goal from reunification to adoption in accordance with the Juvenile Act.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/06/2021